**FILED UNDER SEAL**
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

**FILED**
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

**16 APR 25 AM 3: 48**

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

|  |  |  |
|---|---|---|
| PLAINTIFF UNDER SEAL | ) | Civil Action No. _____ |
|  | ) | Judge _____ |
| v. | ) | **1 :16-cv- 0920 RLY -MJD** |
|  | ) | **FILED UNDER SEAL** |
| DEFENDANT UNDER SEAL | ) | |
|  | ) | **JURY TRIAL DEMANDED** |

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**31 U.S.C. § 3729, ET SEQ.**

Jennifer L. Blackwell
Donald G. Orzeske
GOODIN ORZESKE & BLACKWELL, P.C.
50 East 91st Street, Suite 104
Indianapolis, IN  46236
317-846-4000
317-846-8000 (f)
jblackwell@goblaw.com
dorzeske@goblaw.com

Counsel for Plaintiff/Realtor

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA**

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

16 APR 25 AM 3:49

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

|  |  |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>MICHELLE CALDERON, )<br><br>Plaintiffs, )<br><br>v. )<br><br>CARRINGTON MORTGAGE SERVICES, LLC, )<br><br>Defendant. ) | Civil Action No. _____<br>Judge _____<br><br>**FILED UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS 31 U.S.C. § 3729, ET SEQ.

This is an action brought on behalf of the United States of America by Michelle Calderon, by and through her attorneys, GOODIN ORZESKE & BLACKWELL, P.C., against Defendant Carrington Mortgage Services, LLC ("Carrington"), pursuant to the qui tam provisions of the Federal Civil False Claims Act, 31 U.S.C. §3729, et seq.

### I.     JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §3732(a), 28 U.S.C. §1331, and 28 U.S.C. §1345.

2.     This Court has personal jurisdiction over the Defendant because, among other things, the Defendant transacts business in this District, and Defendant engaged in wrongdoing in this District.

3.     Venue is proper in this District under 31 U.S.C. §3732(a), 28 U.S.C. §11391(b) and (c).  Defendant transacts business within this District, and acts proscribed by 31 U.S.C. §3729 occurred in this District.

4.     The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendant to conceal from the United States its wrongdoing in connection with the allegations made herein.

## II.     INTRODUCTION

5.     This is a civil fraud action on behalf of the United States to recover treble damages and civil penalties under the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729 *et seq.,* and common law damages arising from fraud on the United States Department of Housing and Urban Development ("HUD") and the Federal Housing Administration ("FHA"), in connection with Carrington's residential mortgage lending business.

6.     From at least March, 2013 through March, 2015, ("Covered Period"), Carrington was authorized to approve residential mortgage loans for government insurance and refinancing by the FHA.  However, before Carrington could approve a loan for government insurance or refinancing, it had to confirm that the loan met the underwriting requirements applicable to FHA loans. Notwithstanding this requirement, throughout the Covered Period, Carrington routinely approved loans for government insurance and refinancing that clearly did not meet the applicable underwriting requirements. Indeed, thousands of the loans that Carrington approved for government insurance or refinancing during the Covered Period had multiple, obvious violations of the applicable underwriting requirements, including instances where: (1) the loan files were missing required documents, such as pay stubs, bank statements, and W-2's; (2) the documents in the loan files were inconsistent with one another, such as where the income reflected on a borrower's pay stubs was inconsistent with the income reflected on the borrower's W-2's; and (3) in the case of refinances, the loans were delinquent at the time of closing.

3

7.      Carrington nevertheless certified that all of the loans that it approved for government insurance or refinancing met all of the underwriting requirements applicable to FHA loans. These false certifications misled HUD into believing that thousands of loans had been properly underwritten and were eligible for government insurance or refinancing when, in fact, the loans were high-risk and did not qualify for such insurance or refinancing. Based on these false certifications, HUD accepted numerous loans for government insurance or refinancing that they otherwise would not have accepted for such insurance or refinancing. When these deficient loans ultimately defaulted, HUD, which had insured the loans against default based on Carrington's false certifications, was left to cover the losses.

8.      Furthermore, Carrington has been manipulating TOTAL Mortgage Scorecard ("TOTAL") - a credit-rating algorithm maintained by the FHA that works in conjunction with Carrington's automated underwriting system ("AUS") - to obtain "accept/approve" ratings for its FHA loans, in violation of HUD rules. TOTAL rates loans as either "accept/approve" or "refer" based on data points that Carrington enters into its AUS, including, for example, the dollar value of the borrowers' income and assets. Loans that receive an "accept/approve" rating are subject to less stringent documentation requirements and underwriter scrutiny than loans that receive a "refer" rating. During the Covered Period, if Carrington ran a loan through its AUS and the loan did not receive an "accept/approve" rating from TOTAL, Carrington frequently: (l) re-ran the loan through its AUS/TOTAL multiple times over a short period, each time entering into the AUS/TOTAL hypothetical data points that lacked a factual basis, to determine the data point values that would result in an "accept/approve" rating; and then (2) communicated the qualifying data point values to the borrower or broker, thus recklessly increasing the risk of borrower fraud.

9.     Finally, during the Covered Period, Carrington repeatedly violated HUD's self-reporting requirement and kept a substantial number of its deficient loans a secret. Carrington knew that HUD rules required it to perform quality control reviews on a subset of the loans it had approved for FHA insurance, and to self-report to HUD any loans that it identified as having been affected by fraud or other serious violations. This self-reporting requirement was meant to enable HUD to investigate bad loans and to request reimbursement or indemnification from lenders, as appropriate. Carrington, however, repeatedly failed to comply with the self-reporting requirement, thus concealing from HUD many of its bad loans and questionable underwriting practices.

### III.    PARTIES

10.     Plaintiff/Relator Michelle Calderon is a resident of Carmel, Indiana, and is a former employee of Carrington Mortgage Services, LLC. In March 2013, Calderon joined Carrington as an underwriter in its Fishers, Indiana office. Relator has provided the government with information and documents in accordance with 31 U.S.C. §3730(b)(2). Relator is an original source of this information, and this complaint is not based upon publicly disclosed information.

11.     Defendant Carrington Mortgage Services, LLC is organized under the laws of the State of California, with a principal place of business in Santa Ana, California. Carrington operates various operations centers that provide mortgage loan servicing. Carrington has been approving loans for insurance and refinancing by the FHA company-wide since 2007, and in Indiana since at least March of 2013.

## IV.   FACTUAL BACKGROUND

**1.    HUD's Direct Endorsement Lender Program.**

   A.    Background.

   12.    The FHA, a part of HUD (and included within the term "HUD" for purposes of this complaint), is the largest insurer of residential mortgage loans in the world. Pursuant to the National Housing Act of 1934, HUD offers various mortgage insurance programs.   Through these programs, the FHA insures approved lenders ("mortgagees" or "Direct Endorsement Lenders") against losses on mortgage loans made to buyers of single-family homes.

   13.    Under HUD's mortgage insurance programs, if a homeowner defaults on an FHA insured loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property.   By protecting mortgage holders against defaults on mortgages, FHA mortgage insurance encourages lenders to make loans to millions of creditworthy Americans who might not qualify for loans under conventional underwriting criteria.   FHA mortgage insurance also makes mortgage loans valuable in the secondary markets, as FHA loans are expected to have met HUD underwriting requirements and because they are secured by the full faith and credit of the United States.

   14.    HUD's Direct Endorsement Lender program is one of HUD's mortgage insurance programs. Under this program, an approved lender (*i.e.,* a Direct Endorsement Lender) is authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for HUD, and certify loans for FHA mortgage insurance without prior review or approval of the loans by the FHA or HUD.   Direct Endorsement Lenders are private entities, such as banks and mortgage companies.

15.    To qualify for FHA mortgage insurance, a mortgage must meet all of the applicable HUD underwriting requirements.  These underwriting requirements relate to, among other things, the adequacy of the borrower's income and assets to meet his or her mortgage payments and the borrower's credit history.

16.    HUD relies on the experience and expertise of Direct Endorsement Lenders in approving loans for FHA insurance. HUD expects Direct Endorsement Lenders to determine whether borrowers represent an acceptable credit risk for HUD.  Direct Endorsement Lenders are therefore obligated to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in their dealings with HUD.  The duty of good faith also requires all Direct Endorsement Lenders to make full and fair disclosures to HUD of all material facts and to take on the affirmative duty of employing reasonable care to avoid misleading HUD in all circumstances.

B.    HUD Underwriting Due Diligence Requirements.

17.    Direct Endorsement Lenders are responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the loan. Direct Endorsement Lenders must employ underwriters to "evaluate [each] mortgagor's credit characteristics, [the] adequacy and stability of [the mortgagor's] income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.S(d).

18.    Direct Endorsement Lenders must also ensure that their underwriters: (l) are capable of detecting fraud, as well as warning signs that may be indicators of fraud; and (2) exercise due diligence in making underwriting decisions. HUD Handbook 4000.4 REV-1, ¶¶ 2-4(C)(5); HUD Handbook 4155.2 ¶ 2.A.4.b.

19. HUD relies on Direct Endorsement Lenders to conduct due diligence on all loans before approving them for FHA insurance. To satisfy this due diligence requirement, Direct Endorsement Lenders must: (1) evaluate each borrower's ability and willingness to repay the mortgage debt *(i.e.,* conduct a credit analysis), to limit the possibility of default and collection difficulties, *see* 24 C.F.R. § 203.5(d); and (2) examine the property offered as security for the loan to determine if it provides sufficient collateral *(i.e.,* conduct an analysis of the subject property), *see* 24 C.F.R. § 203.5(e)(3). The due diligence requirement thus requires an evaluation of, among other things, a borrower's credit history, income, assets, and collateral. In all cases, each Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R. § 203.5(c).

20. HUD has set specific rules for due diligence predicated on sound underwriting principles. In particular, HUD requires Direct Endorsement Lenders to comply with all governing HUD Handbooks and Mortgagee Letters, which set forth the underwriting requirements applicable to Direct Endorsement Lenders. These materials specify the minimum due diligence requirements with which Direct Endorsement Lenders must comply in endorsing loans for FHA insurance.

21. HUD requires initial rejections to be reported in the AUS system, through FHA Connection, to put HUD on notice of prior failed applications.

22. In conducting the required credit analysis for a loan, the Direct Endorsement Lender must evaluate the borrower's credit in accordance with all governing HUD Handbooks, such as HUD Handbook 4155.1 (Mortgage Credit Analysis for Mortgage Insurance on One- to

Four-Unit Mortgage Loans).  The rules set forth in HUD Handbook 4155.1 exist to ensure that each Direct Endorsement Lender sufficiently evaluates whether each borrower has the ability and willingness to repay the mortgage debt. HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

C.     Underwriting Loans Using an AUS/TOTAL.

23.     Underwriters employed by Direct Endorsement Lenders may underwrite loans one of two ways: (1) manually, or (2) by using a HUD-approved automated underwriting system.

24.     All HUD-approved AUSs interface with, and operate in conjunction with, a credit-evaluating algorithm maintained by the FHA called *Technology Open to Approved Lenders* ("TOTAL") Mortgage Scorecard.  When a loan is underwritten using an AUS/TOTAL, the Direct Endorsement Lender enters various credit variables into the AUS, such as the dollar amount of the borrower's monthly income and available assets, and then, based on those variables, TOTAL evaluates the borrower's overall credit and assigns the loan a rating.  This rating indicates the level of underwriting that must be performed on the loan.

25.     If TOTAL concludes that a borrower's credit is acceptable, it assigns the loan an "accept/approve" rating, which means that the loan may be underwritten with less stringent documentation requirements and without the underwriter having to evaluate the borrower's creditworthiness.  By contrast, if TOTAL concludes that a borrower's credit requires further analysis, it assigns the loan a "refer" rating, in which case the loan must be manually underwritten and is subject to more stringent documentation requirements and underwriter scrutiny.

26.     For loans that are underwritten manually (*i.e.,* not using an AUS/TOTAL), Direct Endorsement Lenders must, among other things, analyze credit histories, analyze debt obligations, calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules, and consider and document any compensating factors permitting deviations from the fixed ratios. These requirements do not apply to loans that receive an "accept/approve" rating from TOTAL.

27.     Direct Endorsement Lenders are not permitted to manipulate the information they enter into an AUS/TOTAL to determine what specific variable amounts would result in an "accept/approve" rating. For example, if a Direct Endorsement Lender receives a "refer" rating after entering all relevant data points into an AUS/TOTAL, the lender may not then enter hypothetical income or asset amounts (*i.e.,* income or asset amounts that lack a factual basis) in an effort to determine what level of income or assets would generate an "accept/approve" rating. Rather, as made clear by Mortgagee Letter 05-15 and FHA's TOTAL Mortgage Scorecard User Guide, there must be a factual basis for each variable entered into an AUS/TOTAL. Lenders are not to "willfully manipulate the application variables ... to obtain an accept/approve risk classification." Mortgagee Letter 05-15.

28.     The prohibition on entering unsubstantiated data points into AUS/TOTAL exists, among other reasons, to protect against fraud. For instance, if a Direct Endorsement Lender entered factually unsupported income or asset amounts into an AUS - and thereby determined the precise amount of income or assets necessary to obtain an "accept/approve" rating from TOTAL - the lender could falsify loan documents to state that the borrower possesses the required amount of income or assets. Similarly, if a Direct Endorsement Lender manipulated an AUS/TOTAL to determine the precise amount of income or assets necessary to obtain an

"accept/approve" rating and then communicated that information to the borrower or his or her agent, the borrower could falsify loan documents to state that he or she possesses the required amount of income or assets.

     D.    <u>HUD Underwriting Rules Governing Refinances.</u>

29.    In addition to approving new loans for FHA insurance, Direct Endorsement Lenders are authorized to approve pre-existing FHA loans for refinancing. A refinancing generally results in the lowering of the borrower's monthly principal and interest payments. Direct Endorsement Lenders are paid fees in connection with each pre-existing FHA loan they approve for refinancing. Direct Endorsement Lenders therefore have a monetary incentive to approve FHA loans for refinancing.

30.    To satisfy the due diligence requirement in connection with refinances, Direct Endorsement Lenders must ensure, among other things, that "[t]he borrower is current on the loan being refinanced for the month due prior to the month in which he/she closes the refinancing, and for the month in which he/she closes the refinancing." HUD Handbook 4155.1.3.A.1.h; *see also* HUD Handbook 4155.1, REV-5, ¶¶1-10(E), 1-12(D)(6). Thus, for example, if a refinancing closes on May 18, the Direct Endorsement Lender must ensure that the borrower made both the April and the May payments at or before the May 18 closing. *See id.*

     E.    <u>HUD Individual Loan Certifications.</u>

31.    For each loan that a Direct Endorsement Lender approves for FHA insurance or refinancing, the lender must certify that it conducted due diligence to ensure that the endorsed mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A. For each loan that is underwritten using an

AUS/TOTAL, the Direct Endorsement Lender must additionally certify to "the integrity of the data supplied by the lender" to the AUS/TOTAL. *Id.*

32.     Whether a loan is underwritten manually or using an AUS/TOTAL, the Direct Endorsement Lender must further certify as follows: "I, the undersigned, as authorized representative of mortgagee at the time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4." *Id.* HUD Handbook 4000.4 requires, among other things, that the mortgage comply "with HUD underwriting requirements as contained in all outstanding HUD handbooks and Mortgagee Letters." HUD Handbook 4000.4, Appendix 3.

33.     Absent a truthful individual loan certification, a Direct Endorsement Lender is not permitted to approve a loan for FHA insurance or refinancing.

**2.     Since at least March of 2013, Carrington has Submitted Numerous False Individual Loan Certifications to HUD.**

34.     From March 2013 through March 2015, Carrington recklessly underwrote numerous FHA loans, and falsely certified to HUD that the loans were eligible for FHA insurance ("government insurance"). During the Covered Period, Carrington also recklessly approved numerous pre-existing FHA loans for refinancing, and falsely certified to HUD that the loans were eligible for refinancing. As demonstrated below, the loans that Carrington recklessly approved for government insurance and refinancing did not suffer from minor or technical defects. Rather, the defects involved critical aspects of the loans, were apparent from the face of the loan files, and prevented Carrington from reasonably concluding that the loans were eligible for government insurance or refinancing. Among the most common defects were Carrington's failure to:

a.    obtain the required financial documentation from the borrowers (such as pay stubs, bank statements, and W-2s);

b.    reconcile inconsistent information in the loan files (such as where the income reflected on a borrower's pay stubs was inconsistent with the income reflected on the borrower's W-2s, where documents in a loan file reflected multiple social security numbers for the same borrower, and where documents in a loan file reflected multiple addresses for the same borrower's primary residence);

c.    verify the borrowers' employment and rental histories; and

d.    in the case of refinances, confirm that the loans being refinanced were current at the time of closing.

35.    As a result of Carrington's reckless underwriting and false individual loan certifications, upon information and belief, HUD paid claims on numerous defaulted loans that Carrington knew, or should have known, did not meet the applicable HUD underwriting guidelines and, therefore, were ineligible for government insurance or refinancing. The Government has suffered losses in connection with these claims.

A.    Carrington Recklessly Underwrote and Approved Numerous of Loans for Government Insurance or Refinancing.

36.    As set forth above, for each loan that Carrington approved for FHA insurance, Carrington was required to certify that it had conducted due diligence to ensure that the loan was "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A. In addition, if Carrington used an AUS/TOTAL in approving a loan for FHA insurance, it also had to certify to "the integrity of the data" that it entered into the AUS/TOTAL. *Id.*

37.    For each pre-existing FHA loan that Carrington approved for refinancing, it had to certify that the loan was eligible for refinancing. Specifically, for each such FHA loan, Carrington had to certify, among other things, that the borrower was current on his or her mortgage payments both for the month in which the refinancing closed and for the prior month.

13

HUD Handbook 4155.1.3.A.l.h; HUD Handbook 4155.1, REV-5, ¶¶1-10(E), 1-12(D)(6); Form HUD-92900-A.

38. Notwithstanding the above certifications, throughout the Covered Period, Carrington routinely failed to conduct the required due diligence on the loans it approved for government insurance and refinancing. Thousands of these loans contained at least one material violation of the applicable HUD underwriting guidelines, and many of the loans contained two or more such violations. Moreover, the violations were not difficult to detect; rather, they were apparent from the face of the documents in the loan files. Any reasonably diligent underwriter should have noticed the violations in underwriting the loans, and any reasonably diligent quality control personnel should have uncovered the violations while conducting the mandatory quality control reviews of Carrington's closed loan files. Accordingly, Carrington knew, or should have known, that a substantial number of the loans that it approved for government insurance and refinancing contained unacceptable risk and did not qualify for such insurance or refinancing.

39. Furthermore, in violation of the additional certification applicable to FHA loans underwritten using an AUS/TOTAL, Carrington entered data into its AUS/TOTAL that lacked integrity. Specifically, when loans did not receive an "accept/approve" rating from TOTAL, many Carrington loan officers and/or underwriters resubmitted the loans to TOTAL multiple times over a short period, each time entering into Carrington's AUS hypothetical data points that lacked a factual basis in order to determine the data point values that would generate an "accept/approve" rating. Many of these employees then communicated the qualifying data point values to the borrowers or their agents, thus inviting borrower fraud. By telling the borrowers the precise data point values that would qualify them for an FHA loan, Carrington provided the borrowers with the information they needed to create and submit fraudulent loan documents.

Carrington also gave the borrowers an incentive to submit fraudulent documents; the borrowers knew that if they submitted fraudulent documents reflecting the qualifying data point values, they would qualify for an FHA loan.

40.     In addition to recklessly approving loans for FHA insurance in obvious violation of HUD's underwriting guidelines, many Carrington employees systematically manipulated the data they entered into Carrington's AUS to determine the variable amounts that would generate "accept/approve" ratings from TOTAL.

41.     When a Carrington employee initially ran a loan through the its AUS/TOTAL, he or she would enter variable amounts consistent with the borrower's representations and/or the documents in the loan file.  However, if a loan received a "refer" rating, many Carrington employees would isolate one or more variables *(e.g.,* the borrower's assets and/or income) and slightly yet systematically increase or decrease the variable(s) during successive AUS/TOTAL runs over a short period of time to identify the variable amount(s) that would result in an "accept/approve" rating. After identifying the qualifying variable amount(s), many of these employees would then communicate that information to the borrower or his or her agent, thus inviting the borrower to create and submit fraudulent documents reflecting the qualifying variable amount(s).

42.     In short, during the Covered Period, Carrington engaged in reckless underwriting practices, and falsely certified that thousands of loans were eligible for government insurance or refinancing when they were not.  As a result of Carrington's false certifications, upon information and belief, the United States has suffered substantial losses in connection with claims that HUD has paid on defaulted mortgage loans that were not eligible for government insurance or refinancing.

## COUNT I

**Violations of the False Claims Act; Presenting or Causing False Claims to be Presented**
**(Reckless Underwriting)**
**(31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. 3729(a)(1)(A))**

43.     Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

44.     Relator seeks relief against Carrington under Section 3729(a)(1) of the FCA, 31 U.S.C. §3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the FCA, 31 U.S.C. §3729(a)(l)(A).

45.     As set forth above, during the Covered Period, Carrington knew, or should have known, that it was regularly approving for government insurance and refinancing a substantial number of loans that were not eligible for such insurance or refinancing.   Nonetheless, Carrington certified that its entire portfolio of FHA loans was eligible for government insurance or refinancing, and thereby falsely certified that numerous FHA loans were eligible for insurance or refinancing when they were not.

46.     Upon information and belief, Carrington knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented or caused to be presented false or fraudulent claims for payment or approval.   Carrington did so by, among other things, submitting false individual loan certifications to HUD, which prompted HUD to accept loans for government insurance and refinancing that did not qualify for such insurance or refinancing.

47.     Upon information and belief, HUD has paid claims, and incurred losses, on FHA loans because Carrington falsely certified that they were eligible for government insurance or refinancing.

48.     By reason of the foregoing, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## COUNT II

**Violations of the False Claims Act; Use of False Statements in Support of False Claims (Reckless Underwriting)**
**(31 U.S.C. § 3729(a)(2) (2006), and, as amended, 31 U.S.C. 3729(a)(1)(B))**

49.     The Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

50.     The Relator, on behalf of the Government, seeks relief against Carrington under Section 3729(a)(2) of the FCA, 31 U.S.C. § 3729(a)(2) (2006), and, as amended, Section 3729(a)(l)(B) of the FCA, 31 U.S.C. § 3729(a)(l )(B).

51.     As set forth above, during the Covered Period, Carrington knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with numerous FHA loans that Carrington falsely certified were eligible for government insurance or refinancing. Specifically, during the Covered Period, Carrington submitted numerous false individual loan certifications to HUD representing, among other things, that each loan was eligible for government insurance or refinancing.

52.     Upon information and belief, HUD has paid claims, and incurred losses, on FHA loans because Carrington falsely certified that they were eligible for government insurance or refinancing.

53.     By reason of the foregoing, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

### COUNT III

### Breach of Fiduciary Duty

54.     The Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

55.     During the Covered Period, HUD and Carrington had a special relationship of trust and confidence by virtue of Carrington's participation in HUD's Direct Endorsement Lender program.  This program empowered Carrington to obligate HUD to insure and guarantee loans that Carrington issued without any independent review by HUD. Carrington was therefore in a position of advantage or superiority in relation to HUD, and was a fiduciary of HUD.

56.     As a fiduciary, Carrington had a duty to act for, and give advice to, HUD for the benefit of HUD as to whether loans should be insured/guaranteed by the FHA, or approved for refinancing.

57.     As a fiduciary, Carrington had an obligation to act in the utmost good faith, candor, honesty, integrity, fairness, undivided loyalty, and fidelity in its dealings with HUD.

58.     As a fiduciary, Carrington had a duty to exercise sound judgment, prudence, and due diligence on behalf of HUD in approving loans for government insurance and refinancing.

59.     As a fiduciary, Carrington had a duty to refrain from taking advantage of HUD by the slightest misrepresentation, to make full and fair disclosures to HUD of all material facts, and to use reasonable care to avoid misleading HUD in all circumstances.

60.     As set forth above, Carrington breached its fiduciary duties to HUD.

18

61.     As a result of these breaches, upon information and belief, HUD has paid claims and incurred losses relating to numerous loans that Carrington wrongfully approved for government insurance or refinancing.

62.     By reason of these breaches, the Government is entitled to compensatory damages in an amount to be determined at trial.

## COUNT IV

### Gross Negligence

63.     The Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

64.     Carrington owed HUD a duty of reasonable care and a duty to conduct due diligence in connection with the loans it approved for government insurance and refinancing.

65.     As set forth above, Carrington breached its duties to HUD.

66.     As set forth above, Carrington recklessly disregarded its duties to HUD.

67.     As a result of Carrington's gross negligence, upon information and belief, HUD has paid claims and incurred losses relating to numerous loans that Carrington wrongfully approved for government insurance or refinancing.

68.     By reason of this gross negligence, the Government is entitled to compensatory and punitive damages, in an amount to be determined at trial.

## COUNT V

### Negligence

69.     The Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

70.     Carrington owed HUD a duty of reasonable care and a duty to conduct due diligence in connection with the loans it approved for government insurance and refinancing.

71.     As set forth above, Carrington breached its duties to HUD.

72.     As a result of Carrington's negligence, upon information and belief, HUD have paid claims and incurred losses relating to numerous loans that Carrington wrongfully approved for government insurance or refinancing.

73.     By reason of this negligence, the Government is entitled to compensatory damages, in an amount to be determined at trial.

## COUNT VI

### Unjust Enrichment

74.     The Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

75.     Upon information and belief, Carrington submitted, and HUD paid to Carrington, claims in connection with defaulted mortgage loans that Carrington falsely certified were eligible for government insurance or refinancing.

76.     By reason of these payments by HUD, Carrington was unjustly enriched.   The circumstances of Carrington's receipt of the above-referenced payments are such that in equity and good conscience Carrington should not retain the payments, in an amount to be determined at trial.

## COUNT VII

### Payment Under Mistake of Fact

77.     The Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

78.     The Relator, on behalf of the Government, seeks relief against Carrington to recover payments made under mistake of fact.

79.     Upon information and belief, Carrington submitted, and HUD paid to Carrington, claims in connection with defaulted mortgage loans that Carrington falsely certified were eligible for government insurance or refinancing.

80.     Upon information and belief, HUD made payments to Carrington under the mistaken belief that the defaulted loans had been eligible for government insurance or refinancing, and that Carrington had been exercising due diligence in its underwriting.   Upon information and belief, HUD also made payments to Carrington under the mistaken belief that Carrington had been self-reporting loans as required.

81.     By reason of these payments by HUD, the Government has been damaged in a substantial amount to be determined at trial.

WHEREFORE, the Relator, on behalf of the Government, respectfully requests that judgment be entered in the Government's favor and against Carrington as follows:

a.   For judgment against Defendant for each and every false or fraudulent claim;
b.   For treble damages;
c.   For compensatory damages;
d.   For punitive damages;
e.   For such civil penalties as are required by law;
f.   For fees and costs pursuant to 31 U.S.C. § 3729(a); and
g.   For such further relief as the Court deems proper.


Dated: Indianapolis, Indiana
       April _____, 2016


## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully submitted,

_____

Jennifer L. Blackwell, Atty No:  19269-49
Donald G. Orzeske, Atty No: 10362-49
GOODIN ORZESKE & BLACKWELL, P.C.
50 East 91st Street, Suite 104
Indianapolis, IN  46236
317-846-4000
317-846-8000 (f)
jblackwell@goblaw.com
dorzeske@goblaw.com