UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:16-cv-00920-RLY-MJD |
| CARRINGTON MORTGAGE SERVICES, LLC, | ) ) ) ) | |
| Defendant. | ) ) | |
| MICHELLE CALDERON, | ) ) ) | |
| Relator. | ) | |

**ORDER ON DEFENDANT'S MOTION TO DISMISS**

In this action Relator Michelle Calderon ("Calderon") contends that Defendant Carrington Mortgage Services, LLC ("Carrington"), committed multiple counts of fraud under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, in connection with its residential mortgage lending business. (Filing No. 40, Am. Compl. ¶ 5). The United States of America (the "Government"), which would be a plaintiff in this *qui tam* action, declined to intervene. (Filing No. 10). Pending before the court is Carrington's motion to dismiss the Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. (Filing No. 48).

For the reasons set forth below, Carringtons's motion to dismiss is **GRANTED**.

**I. Legal Standard**

Under the Supreme Court's directive in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to survive Carrington's motion to dismiss pursuant to Rule 12(b)(6), Calderon must provide the grounds for her entitlement to relief with more than labels, conclusions or a formulaic recitation of the elements of a cause of action. *See id.* at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The court assumes that all the allegations in the Amended Complaint are true, but the "allegations must be enough to raise a right to relief above the speculative level." *Id. See also Vesely v. Armslist, LLC*, 762 F.3d 661, 664 (7th Cir. 2014). The touchstone is whether the Amended Complaint gives Carrington "fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Legal conclusions or conclusory allegations are insufficient to state a claim for relief. *See Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015); *McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011). The court may also consider documents attached to or referenced in the Amended Complaint, as well as take judicial notice of publicly available documents, to decide the motion. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

"[C]laims brought under the FCA are subject to the heightened pleading standard of Rule 9(b) . . . ." *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 778-79 (7th Cir. 2016) (quotations and citations omitted). Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To claim fraud with particularity, Calderon must allege "the who, what,

2

when, where, and how: the first paragraph of any newspaper story." *Hanna*, 834 F.3d at 779 (quotation and citation omitted). *See also United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016); *United States v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003).

## II. Background

### A. The Parties

Carrington is a California company with its principal place of business in Santa Ana, California. (Am. Compl. ¶ 11). Carrington operates various centers that provide mortgage loan servicing. (*Id.*). Carrington has been authorized to approve residential mortgage loans for government insurance and refinancing by the Federal Housing Administration ("FHA") between at least March 2013, and March 2015. (*Id.* ¶ 6).

Calderon is a former employee of Carrington who worked as a mortgage underwriter in Carrington's Fishers, Indiana, office. (*Id.* ¶ 10).

### B. The Federal Endorsement Lender Program

The FHA, as part of the Department of Housing and Urban Development ("HUD"), is the largest insurer of residential mortgage loans in the world. (*Id.* ¶ 12). Pursuant to the National Housing Act of 1934, HUD offers various mortgage insurance programs. (*Id.*). Through these programs, FHA insures approved lenders against losses on mortgage loans made to buyers of single-family homes. (*Id.*). Under these mortgage insurance programs, if a homeowner defaults on an FHA insured loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property. (*Id.*). By protecting

mortgage holders against defaults on mortgages, FHA mortgage insurance encourages lenders to make loans to millions of creditworthy Americans who might not qualify for loans under conventional underwriting criteria. (*Id.*). FHA mortgage insurance also makes mortgage loans valuable in the secondary markets because FHA loans are expected to have met HUD underwriting requirements and because they are secured by the full faith and credit of the United States. (*Id.*).

HUD's Direct Endorsement Lender program is one of HUD's mortgage insurance programs. (*Id.* ¶ 14). Under this program, an approved lender is authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for HUD, and certify loans for FHA mortgage insurance without prior review or approval of the loans by the FHA or HUD. (*Id.*). Direct Endorsement Lenders are private entities such as banks and mortgage companies. (*Id.*).

HUD relies upon the experience and expertise of Direct Endorsement Lenders in approving loans for FHA insurance. (*Id.* ¶ 16). HUD expects Direct Endorsement Lenders to determine whether borrowers represent an acceptable credit risk for HUD. (*Id.*). And, to qualify for FHA mortgage insurance, a mortgage must meet all of the applicable HUD underwriting requirements, which relate to, among other things, the adequacy of the borrower's income and assets to meet his or her mortgage payments, and the borrower's credit history. (*Id.* ¶ 15). Therefore, Direct Endorsement Lenders are obligated to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in their dealings with HUD. (*Id.* ¶ 16). The duty of good faith requires all Direct Endorsement Lenders to make full and fair disclosures to HUD of all material facts and

to take on the affirmative duty of employing reasonable care to avoid misleading HUD. (*Id.*).

More specifically, Direct Endorsement Lenders are responsible for all aspects of the mortgage application, the property analysis, and the underwriting of a mortgage loan. (*Id.* ¶ 17). This requires Direct Endorsement Lenders to employ underwriters to "evaluate [each] mortgagor's credit characteristics, [the] adequacy and stability of [the mortgagor's] income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." (*Id.* quoting 24 C.F.R. § 203.S(d)).

HUD also relies on Direct Endorsement Lenders to conduct due diligence on all loans before approving them for FHA insurance and has set specific rules for such due diligence. (*Id.* ¶¶ 19 & 20). The relevant regulations on due diligence provide that a Direct Endorsement Lender must: (1) evaluate each borrower's ability and willingness to repay the mortgage debt (i.e., conduct a credit analysis), to limit the possibility of default and collection difficulties, 24 C.F.R. § 203.5(d); and (2) examine the property offered as security for the loan to determine if it provides sufficient collateral (i.e., conduct an analysis of the specific property), 24 C.F.R. § 203.5(e)(3). (*Id.* ¶ 19). In doing such analyses, the Direct Endorsement Lender must "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent upon the property as security to protect its investment." (*Id.* quoting 24 C.F.R. § 230.5(c)). Further, HUD requires Direct Endorsement Lenders to

comply with all governing HUD Handbooks and Mortgagee Letters, which set forth the applicable minimum underwriting requirements. (*Id.* ¶ 20).

Carrington is a Direct Endorsement Lender. (*Id.* ¶¶ 6, 11).

To evaluate and, ultimately, extend loans, Carrington uses FHA's underwriting software, Technology Open to Approved Lenders ("TOTAL") and its own HUD-approved automated underwriting system ("AUS"). (*Id.* ¶¶ 23-24). When using these systems to underwrite a loan, Carrington enters various credit variables into the AUS, such as the dollar amount of the borrower's monthly income and available assets, then uses TOTAL to evaluate the borrower's overall credit and assign the loan a rating. (*Id.* ¶ 24). The rating indicates the level of underwriting that must be performed on the loan. (*Id.*). An "accept/approve" rating means that the loan may be underwritten with less stringent documentation requirements and without an underwriter's evaluation of the borrower's creditworthiness. (*Id.* ¶ 25). However, if TOTAL assigns a "refer" rating to the loan, it must be manually underwritten and is subject to more stringent documentation requirements. (*Id.*). Manual underwriting requires Carrington to analyze credit histories; analyze debt obligations; calculate debt and income ratios, and compare those ratios to the fixed ratios set by HUD rules; and consider any compensating factors permitting deviations from the fixed ratios. (*Id.* ¶ 26). According to guidance provided to Carrington by the FHA, it is not permitted to manipulate the information input into the AUS/TOTAL system, rather, there must be a factual basis for each variable Carrington enters into the system. (*Id.* ¶ 27).

At the end of this process, regardless of whether the TOTAL rating is "accept/approve" or "refer," Carrington provides loan-specific certification that the data used by Carrington had "integrity" and that the loan is "eligible for HUD mortgage insurance."[1] (*Id.* ¶¶ 31, 36). According to the regulations, once FHA insures a loan based on Carrington's recommendation, a Mortgage Insurance Certificate issues, which creates a "contract of insurance" between the lender and HUD that incorporates HUD's regulatory requirements and binds both parties "with the same force and to the same extent as if a separate contract had been executed relating to the insured mortgage." 24 C.F.R. § 203.257.

HUD also has authorized Carrington to approve pre-existing FHA loans for refinancing. (Am. Compl. ¶ 29). In connection with the refinance process, Carrington, among other things, must ensure that "[t]he borrower is current on the loan being refinanced for the month due prior to the month in which he/she closes the refinancing, and for the month in which he/she closes the refinancing." (*Id.* ¶ 30 (quoting HUD Handbook 4155.1.3A.1.h) (citing HUD Handbook 4155.1, REV-5, ¶¶ 1-10(E), 1-12(D)(6))). Carrington receives a fee for every loan for which it approves refinancing. (*Id.* ¶ 29).

---

[1] Carrington cited to Form HUD-92900-A to support this statement, which is referenced in the Amended Complaint ¶¶ 31-32 and 36-37; however, it was not attached to the affidavit submitted with Carrington's brief as stated therein. To the extent necessary, the court will access the form from the HUD website. https://www.hud.gov/sites/documents/92900-A.PDF (last visited Nov. 27, 2017).

### C. Allegations Under the FCA

Calderon alleges that between March 2013, and March 2015, Carrington recklessly underwrote numerous FHA loans and falsely certified to HUD that the loans were eligible for FHA insurance. (*Id.* ¶ 34). She asserts that Carrington also recklessly approved numerous pre-existing FHA loans for refinancing and falsely certified to HUD that the loans were eligible for such refinancing. (*Id.*). Calderon claims that "[a] handful of examples of said loans are as follows: Jewih (file# 1403021634), Ferrari (file# 400502853), Gruen (file# 1401014232), Sanchez (file# 400504637), Walker (file# 400502708) and Beatneh (file# U13JT0190)." (*Id.*). Further, Calderon states,

> Among the most common defects were Carrington's failure to:
>
> a. obtain the required financial documentation from the borrowers (such as pay stubs, bank statements, and W-2s);
>
> b. reconcile inconsistent information in the loan files (such as where the income reflected on a borrower's pay stubs was inconsistent with the income reflected on the borrower's W-2s, where documents in the loan file reflected multiple social security numbers for the same borrower, and where documents in a loan file reflected multiple addresses for the same borrower's primary residence);
>
> c. verify the borrowers' employment and rental histories; and
>
> d. in the case of refinances, confirm that the loans being financed were current at the time of closing.

(*Id.*). Calderon further alleges that Carrington failed to conduct the required due diligence on thousands of loans, and that the defects "were apparent from the face of the documents in the loan files." (*Id.* ¶ 38). She claims that examples of such loans include: Jewih (file# 1403021634); Ferrari (file# 400502853); Gruen (file# 1401014232); Sanchez

(file# 400504637); Walker (file# 400502708); and Beatnah (file # U13JT0190). (*Id.*). Calderon asserts that any reasonably diligent quality control person should have caught these violations. (*Id.*). "Accordingly, Carrington knew, or should have known, that a substantial number of the loans that it approved for government insurance and refinancing contained unacceptable risk and did not qualify for such insurance or refinancing." (*Id.*). Calderon avers that the reckless underwriting and false individual loan certifications were carried out by, through, or dictated by at least the following employees: Jim Sims; Jeremy Milner; Leslie White; Scott Woodard; Raymond Brousseau; Lisa Pratt; Cassandra Miller; Mike Lumpkin; Ryan Sears; George Mueller; Rich Marfino; Bruce Rose; and Jeff Gillis. (*Id.* ¶ 35).

Moreover, with respect to loans underwritten using AUS/TOTAL, Calderon alleges that Carrington entered data that lacked integrity on a daily basis. (*Id.* ¶39). Specifically, many Carrington loan officers would resubmit loans to TOTAL multiple times over a short period using hypothetical data points to determine which values would generate an "accept/approve" rating. (*Id.* ¶¶ 39-41). Many of Carrington's employees would then share the qualifying data values with the potential borrowers. (*Id.*). Calderon claims that the Carrington employees who carried out, or directed this practice included: Jim Sims; Jeremy Milner; Leslie White; Scott Woodard; Raymond Brousseau; Lisa Pratt; Cassandra Miller; Mike Lumpkin; Ryan Sears; George Mueller; Rich Marfino; Bruce Rose; and Jeff Gillis. (*Id.* ¶¶ 39, 40 & 42).

Calderon states that as a result of Carrington's continued reckless underwriting and false individual loan certification practices, "HUD paid claims on thousands of loans

that Carrington knew, or should have known, did not meet the applicable HUD underwriting guidelines and, therefore, were ineligible for government insurance or refinancing. The Government has suffered substantial losses in connection with Carrington's claims, in excess of $200,000,000." (*Id.* ¶ 35)

In Count I, Calderon alleges that Carrington presented or caused false claims to be presented to HUD in violation of 31 U.S.C. § 3729(a)(1), and, as amended, 31 U.S.C. § 3729(a)(1)(A), and seeks treble damages and a civil penalty for each violation. (*Id.* ¶¶ 43-48).

In Count II, Calderon alleges that Carrington "knowingly, . . . or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with numerous FHA loans" in violation of 31 U.S.C. § 3729(a)(2), and, as amended, 31 U.S.C. § 3729(a)(1)(B), and seeks treble damages and a civil penalty for each violation. (*Id.* ¶¶ 49-53).

**D. State Law Claims**

Based on the same set of operative facts, Calderon also asserts a number of claims under state law. In Count III, she alleges that Carrington breached a fiduciary duty it owed to HUD. (*Id.* ¶¶ 54-62). In Counts IV & V, Calderon alleges that Carrington recklessly breached its duty of care to HUD, and/or unreasonably breached its duty of care to HUD, with respect to the falsely-made loans. (*Id.* ¶¶ 63-73). In Count VI, Calderon alleges that Carrington was unjustly enriched by payment from HUD for claims in connection with defaulted, falsely-obtained loans. (*Id.* ¶¶ 74-76). And, in Count VII,

Calderon alleges that HUD paid Carrington for claims in connection with defaulted, falsely-obtained mortgages under a mistaken belief that the loans met the requisite underwriting standards. (*Id.* ¶¶ 77-81).

## III. Discussion

### A. The FCA Claims

The FCA proscribes the knowing submission of false or fraudulent claims to the government for payment. *See* 31 U.S.C. § 3729(a)(1). To plead a claim under § 3729(a)(1), Calderon must state with sufficient particularity "(1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *United States ex rel. Presser v. Acacia Mental Health*, 836 F.3d 770, 777 (7th Cir. 2016) (quoting *United States ex rel. Yannacopoulos v. Gen'l Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011)). To survive this motion to dismiss, Calderon's "complaint must describe (not prove) a particular false claim she knows or has reason to know (based on indicia of reliability) that a defendant's agent submitted for payment." *Abner v. Jewish Hosp. Healthcare Servs., Inc.*, No. 4:05-cv-0106, 2008 WL 3853361, at *4 (S.D. Ind. Aug. 13, 2008) (citing *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 506-09 (6th Cir. 2007)).

Carrington asserts that Calderon failed to allege the elements of falsity, scienter, or materiality to support her FCA claims. (Filing No. 49 at 18-37). The court addresses each element in turn.

11

### 1. False Information

With respect to falsity, the Amended Complaint alleges three categories of conduct, including reckless underwriting and false certification of loans for FHA insurance and refinancing (Am. Compl. ¶¶ 6, 34, 35, 38); manipulation of data into the AUS/TOTAL system and communicating results to borrowers (*Id.* ¶¶ 8, 27, 39-41); and violation of the HUD self-reporting requirement (*Id.* ¶¶ 9, 38, 80).

#### a. False Certifications

Calderon alleges that Carrington failed to follow applicable HUD underwriting guidelines that resulted in thousands of mortgage loans with unacceptable risk. (*Id.* ¶¶ 6, 34, 38). However, Calderon only identifies, generally, a small sample of such loans. (*Id.* ¶¶ 6, 34, 38). She also identifies several individuals whom she claims carried out or dictated the regular performance of these fraudulent underwriting practices. (*Id.* ¶ 35). Calderon further asserts in her brief that Carrington made over 27,000 claims for payment between January 1, 2014, and May 1, 2017.[2] (Filing No. 53 at 2). But, she never connects a single loan to a specific fraudulent underwriting practice performed by a specific individual. Further, Calderon fails to connect an FHA-insured mortgage obtained through a fraudulent practice to a claim for payment on a defaulted loan made

---

[2] The Amended Complaint makes no mention of the 27,000 claims discussed by Calderon in her response brief. Rather, the Amended Complaint merely states that Carrington caused the government to suffer damages in excess of $200,000,000.00. Am. Compl. ¶ 35. Without some allegation in the Amended Complaint of the number of loans made under the FHA program in comparison to the number of claims made, there is no support for an inference that some of the allegedly falsely-supported FHA loans were part of those that comprise the losses referenced in the Amended Complaint.

by Carrington. Calderon argues that the details linking a particular loan to a particular claim are within the exclusive knowledge of Carrington, therefore, the court should relax the requirements of Rule 9(b). (Filing No. 53 at 2-6 (citing *Singer v. Progressive Care, SC*, 202 F. Supp. 3d 815, 826 (N.D. Ill. 2016); *Kennedy v. Aventis Pharmacy, Inc.*, 512 F. Supp. 2d 1158 (N.D. Ill. 2007))). Although the *Singer* and *Kennedy* courts discuss this relaxed standard, it was only in *Kennedy*, where the requisite information was in the files of a non-party, that the court concluded that the relator had alleged enough facts to create a reasonable inference that the fraudulent activity had resulted in a paid claim. *See Kennedy*, 512 F. Supp. 2d at 1167. In *Singer*, the court rejected the relator's attempt to side-step the actual example requirement because the relator had worked for the defendant and had access to the relevant files. *Singer*, 202 F. Supp. 3d at 826-27. In the instant case, Calderon has failed to make the link between the allegedly fraudulent underwriting practice to a specific person or a specific mortgage, nor did she allege facts that create an inference that at least one of the 27,000 claims she found more likely than not links back to a falsely-certified loan.

### b. Manipulation of AUS/TOTAL Data

Calderon also alleges that underwriters manipulated data they fed into the AUS/TOTAL calculator and shared that data with potential borrowers, which encouraged the borrower to submit false information to get an "accept/approve" rating. (Am. Compl. ¶¶ 8, 39-40). Again, although Calderon names employees who supposedly employed this practice, she fails to link any one of them to a specific mortgage or to one of the loans obtained by any number of allegedly fraudulent ways to manipulate the AUS/TOTAL

13

system. Calderon makes the same Rule 9(b) relaxed standard argument with respect to this allegation that she made for the fraudulent underwriting practices, but, for the reasons stated above, even under the relaxed standard, Calderon has failed to allege enough facts to raise an inference that there is a connection between a loan obtained based on false information and a specific employee or any defaulted loan.

### c. Self-Reporting Violations

For her third fraudulent practice, Calderon alleges that someone directed her not to report a denial for a specific loan application (*Id.* ¶ 9); and, generally, that HUD made payments to Carrington based on the mistaken belief that Carrington had reported all loan denials as required. (*Id.* ¶ 80). However, Calderon again fails to provide a connection between the allegedly wrongful practice and any specific loan or subsequent default of that loan that would require the government to pay Carrington. Further, Calderon claims that such a practice should be caught by quality control reviews, which Calderon admits were performed by Carrington on all of its loans. (*Id.* ¶¶ 9, 38). But, Calderon never points to any loan that Carrington determined to be fraudulent. Again, Calderon provides no argument to rebut the inference that Carrington performed quality audits and uncovered nothing.

For the reasons stated above, Calderon has failed to adequately allege the false information element of her claim under § 3729(a)(1) of the FCA.

### 2. Knowing or Should Have Known Requirement

Carrington also argues that Calderon's allegations of scienter are too conclusory to meet the requisite standard under Rule 9(b). (Filing No. 49 at 26-30). Using the

14

generally accepted definitions of the elements of fraud, knowledge may be averred generally, but there must be a basis for believing that the relator could prove scienter. *See Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 739 (N.D. Ill. 2010) (citing Fed. R. Civ. P. 9(b); *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990)). Calderon failed to address this argument in her response; therefore, the argument in her surreply is waived. *Cf. United States v. Foster*, 652 F.3d 776, 778 n.5 (7th Cir. 2001) (stating that a "reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court"). The court agrees with Carrington that the allegations in the Amended Complaint with respect to what Carrington knew or should have known are too vague to satisfy the relaxed scienter requirement. In the Amended Complaint, Calderon makes broad sweeping statements that "common defects" in hundreds and/or thousands of loans violated HUD underwriting requirements, which made the loans obviously unacceptable risks. (Am. Compl. 6, 32, 34, 37, 38). She never provides a connection between any one defect that made any loan with that defect universally unacceptable and the default of that loan such that Carrington would seek payment under the relevant insurance contract. Further, the Amended Complaint all but admits that underwriting a loan is a discretionary activity that can be subjective, even under HUD's guidelines. (Filing No. 49 at 29-30 (citing Am. Compl. ¶¶ 16-19, 26; 24 C.F.R. § 203.5(d)). In such a circumstance, more details seem to be necessary to support an inference that Carrington knowingly falsified material data for hundreds or thousands of HUD insured loans that were later defaulted. Specifically, such details might include what specific inaccuracies were perpetrated, how they were universally unacceptable, and why, more likely than not, those decisions led to

15

default. Carrington's motion to dismiss should also be granted for lack of specificity on the knowledge requirement.

### 3. Materiality Requirement

Even if Calderon's allegations regarding Carrington's knowledge were sufficient to create an inference of scienter, Calderon must also plead facts regarding the materiality of any alleged failure to comply with HUD underwriting guidelines. Under the FCA, for a misrepresentation about compliance with a statutory, regulatory, or contractual requirement to be actionable, it must be "material to the Government's payment decision . . . ." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016). "The materiality standard is demanding" because "[t]he False Claims Act is not 'an all-purpose fraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs.*, 136 S. Ct. at 2003 (citation omitted). Drawing from statutory and common law definitions of materiality, the *Universal Health Services* Court set out several factors to evaluate the requirement including: (1) whether the government expressly identifies a provision as a condition of payment; (2) whether the defendant knows that the government consistently refuses to pay claims in the "mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" at issue; (3) whether the government pays claims in full despite actual knowledge that certain requirements were violated; and (4) whether the government pays claims in full despite actual knowledge that certain requirements were violated and has signaled that it will not change its position. *Id.* The Court expressly rejected a categorical approach to materiality:

> A misrepresentation cannot be deemed material because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

*Id.* (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543 (1943)).

Carrington contends that Calderon has insufficiently plead the materiality element of an FCA claim because the Amended Complaint fails to identify specific loans that are connected to particular false claims for payment as discussed in the prior sections of this entry. (Filing No. 49 at 32). Carrington also alleges three other reasons that the Amended Complaint fails to sufficiently plead the materiality requirement: (1) the allegations of allegedly false statements amount to no more than contract or regulatory violations; (2) there is no allegation that Carrington knew that certain underwriting requirements were material to HUD's decisions to make payments; and (3) there is no alleged nexus between any specific loan default and any alleged violation of the FHA underwriting requirements. (Filing No. 49 at 33-37). Like with the scienter requirement, Calderon did not address Carrington's argument regarding materiality in her response; therefore, her arguments in surreply are waived. *Cf. Foster*, 652 F.3d at 778 n.5.

Under the strict standard enunciated in *Universal Health Services*, the court must agree with Carrington that the Amended Complaint in this case is deficient with respect to the materiality element. Rather than providing examples of regulatory and/or guideline violations that HUD has considered material in other cases, the Amended Complaint merely recites in a generalized manner that hundreds or thousands of loans

"contained at least one material violation of the applicable HUD underwriting guidelines." (*See*, *e.g.*, Am. Compl. ¶ 38). There is no attempt to address or provide facts from which an inference can be drawn that the "at least one" unidentified violation was actually material to any decision made by HUD, much less a decision to pay Carrington. The court recognizes that the very nature of the underwriting process may make it difficult for Calderon to identify a single material violation; however, she must at least try to make a connection between the allegedly fraudulent underwriting decisions and HUD's subsequent payment of funds to Carrington. Calderon's FCA claims must be dismissed for this reason as well.

### B. State Law Claims

Carrington seeks dismissal of Calderon's state law claims on three grounds: (1) she lacks standing to assert the claims; (2) HUD's contractual relationship with Carrington precludes them; and (3) Calderon failed to plead specific facts to support the claims sounding in fraud. (Filing No. 49 at 37). Citing no case law, Calderon argues that dismissal of the state law claims is premature because the Government may involve itself in this action in the future. (Filing No. 53 at 4). Again citing no case law, Calderon further asserts that as a relator bringing claims on behalf of the Government, she should be allowed to pursue any of its claims against Carrington. (*Id.*).

The FCA is a unique statute in that it grants a private citizen the right to bring claims that belong to the Government. *See* 31 U.S.C. § 3730(b)(1) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action must be brought in the name of the Government. . . .").

However, other than for actions of retaliation against a relator, *see* 31 U.S.C. § 3730(h), it is clear that the proscribed conduct is for actions that harm the Government, not the individual. *See* 31 U.S.C. § 3729 (stating that a person who engages in the listed prohibited conduct with respect to Government funds "is liable to the United States Government"). In the Amended Complaint, the state law claims allege harm to the Government only; there is no allegation of harm to Calderon or property owned by her. In other words, if Carrington engaged in the allegedly wrongful act, the harm it caused would be to the Government, not to Calderon. Calderon has not pointed to any case in which a relator is allowed to proceed with common law claims on behalf of the Government. This court agrees with the cases cited by Carrington that conclude that a relator lacks standing to assert common law claims on behalf of the Government. *See*, *e.g.*, *United States v. Pekin Mem'l Hosp.*, No. 05-cv-1018, 2008 WL 2705443, at *5 (C.D. Ill. July 9, 2008) (dismissing common law claims without prejudice to allow the Government to bring the claims later) (citing, *inter alia*, *United States ex rel. Rockefeller v. Westinghouse Elec. Co.*, 274 F. Supp. 2d 10, 14 (D.D.C. 2003)); *United States ex rel. Grant v. Rush-Presbyterian/St. Luke's Med. Ctr.*, No. 99 C 06313, 2001 WL 40807, at *6 (N.D. Ill. Jan. 16, 2001) (concluding that an allegation of unjust enrichment must be dismissed because the benefits at issue belonged to the Government) (citing *United States ex rel. Long v. SCS Bus. & Tech. Inst.*, 999 F. Supp. 78, 92 (D.D.C. 1998) (deciding that relator cannot bring unjust enrichment claim on behalf of the government), *rev'd on other grounds*, 173 F.3d 870 (D.C. Cir. 1999)); *United States ex rel. Mayman v. Marietta Corp.*, 894 F. Supp. 218, 225026 (D. Md. 1995) (deciding that relator cannot bring

breach of contract claim on behalf of the government). This is a logical conclusion because it is only by statute that a relator may stand in the shoes of the Government under the FCA and there is no similar relationship created under common law. For this reason, Calderon's state law claims on behalf of the Government should be dismissed without prejudice.

## IV. Conclusion

For the reasons stated herein, the court **GRANTS** defendant Carrington Mortgage Services, LLC's, Motion to Dismiss (Filing No. 48). Relator Michelle Calderon's state law claims are dismissed without prejudice, however, she has leave to file a Second Amended Complaint within 21 days of the date of this entry; her failure to do so will result in an entry dismissing the action in favor of defendant.

**SO ORDERED** this 10th day of January 2018.

```
                              _____
                              RICHARD L. YOUNG, JUDGE
                              United States District Court
                              Southern District of Indiana
```

Distributed Electronically to Registered Counsel of Record.