**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | |
| MICHELLE CALDERON, | ) | 1:16-cv-00920-RLY-MJD |
|  | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
|  | ) | |
|  | ) | |
| CARRINGTON MORTGAGE SERVICES, LLC, | ) | |
|  | ) | |
| Defendant. | ) | |

_____ )


**SECOND AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**31 U.S.C. § 3729, ET SEQ.**



Jennifer L. Blackwell
Donald G. Orzeske
ORZESKE - BLACKWELL, P.C.
50 East 91st Street, Suite 104
Indianapolis, IN  46236
317-846-4000
317-846-8000 (f)
jblackwell@indylitigation.com
dorzeske@indylitigation.com

Counsel for Plaintiff/Relator

## SECOND AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## 31 U.S.C. § 3729, ET SEQ.

This is an action brought on behalf of the United States of America by Michelle Calderon, by and through her attorneys, ORZESKE - BLACKWELL, P.C., against Defendant Carrington Mortgage Services, LLC ("Carrington"), pursuant to the qui tam provisions of the Federal Civil False Claims Act, 31 U.S.C. §3729, et seq.

## I.        JURISDICTION AND VENUE

1.        This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §3732(a), 28 U.S.C. §1331, and 28 U.S.C. §1345.

2.        This Court has personal jurisdiction over the Defendant because, among other things, the Defendant transacts business in this District, and Defendant engaged in wrongdoing in this District.

3.        Venue is proper in this District under 31 U.S.C. §3732(a) and 28 U.S.C. §11391(b) and (c).  Defendant transacts business within this District, and acts proscribed by 31 U.S.C. §3729 occurred in this District.

4.        The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendant to conceal from the United States its wrongdoing in connection with the allegations made herein.

## II.        INTRODUCTION

5.        This is a civil fraud action on behalf of the United States to recover treble damages and civil penalties under the False Claims Act ("FCA"), as amended, 31 U.S.C. §§ 3729 *et seq.,* and common law damages arising from fraud on the United States Department of

Housing and Urban Development ("HUD") and the Federal Housing Administration ("FHA"), in connection with Carrington's residential mortgage lending business.

6.      From at least March, 2013 through March, 2015, ("Covered Period"), Carrington was authorized to approve residential mortgage loans for government insurance and refinancing by the FHA.  However, before Carrington could approve a loan for government insurance or refinancing, it had to confirm that the loan met the underwriting requirements applicable to FHA loans. Notwithstanding this requirement, throughout the Covered Period, Carrington, by, through, and dictated by its employees (including, but not limited to, Jim Sims, Jeremy Milner, Leslie White, Scott Woodard, Raymond Brousseau, Lisa Pratt, Cassandra Miller, Rich Marfino, Bruce Rose and Jeff Gillis, and the underwriters set forth in this Paragraph 6) routinely, on a daily basis, approved loans for government insurance and refinancing that clearly did not meet the applicable underwriting requirements.   Indeed, thousands of the loans that Carrington approved for government insurance or refinancing during the Covered Period had multiple, obvious violations of the applicable underwriting requirements, including instances where: (1) the loan files were missing required documents, such as pay stubs, bank statements, W-2's, gift letters and payoff verifications; (2) the documents in the loan files were inconsistent with one another, such as where the income reflected on a borrower's pay stubs was inconsistent with the income reflected on the borrower's other paperwork; and (3) in the case of refinances, the loans were delinquent at the time of closing or had late payments in the previous 12 months.   The following are specific examples of fraudulently approved loans:

     a.   **LOAN 1:** Carrington's practices are exemplified in the following loans, the first of which was to Borrower 1 in Lindale, Texas, which closed in February, 2015. These loans demonstrate the manipulation of the Desktop Underwriting System ("DU") and the failure to use proper underwriting procedures to deceive HUD.

3

i.  On or about November 4, 2014, a third party, on behalf of Borrower 1, issued a $1,000 earnest money check for the purchase of a manufactured home.  No gift letter was submitted.  The file materials submitted for this first casefile, ending in 799 for Borrower 1 (hereinafter "Casefile A"), include only a Uniform Residential Loan Application completed by Borrower 1 on the date of closing, February 5, 2015, which raises questions with regard to the legitimacy of the approval and loan approval process.

ii.  A credit report was completed on Borrower 1 and his wife on November 20, 2014.  Pursuant to the U.S. Department of Housing and Urban Development's Handbook, *HUD 4155.1, Mortgage Credit Analysis for Mortgage Insurance,* 4.A.5.c, (hereinafter "HUD 4155.1") and Carrington Credit Processing Requirements, Volume 1.3, p. 93, a non-purchasing spouse's debt MUST also be considered by the underwriter in certain states, including Texas. Borrower had a poor credit score of 618, and had collections on overdue accounts for credit cards, rent, telephones, and medical care. His wife had a credit score of 597, with $31,417 in outstanding debt, including three in delinquency, seven in collections, and monthly payments of $789.  She also had 25 inquiries on her credit in the previous 120 days.

iii.  The first DU Findings Report in the file is FHA Submission No. 16 (A-16) made on November 19, 2014, which indicates that the DU user, identified as d252xjmw, had already run this borrower through the system 15 times attempting to get him approved with varying information submitted, and is evidence of manipulation of the system and fraudulent submissions. This was run with a somewhat generic input for creditors. Specifically, three creditors were listed and a generic creditor named "collections" with a balance of $1,843 was listed. There is no mention of any debt owed to Nissan Motor, which was in collections, and is listed on borrower's credit report. Carrington's omission of creditors in the DU submissions and lack of explanation of same violates HUD 4155.1, 4.C.1.c and 4.C.2.d.

iv.  On November 23, 2014 at 3:49 p.m., DU A-17 was submitted by DU user 148n2jlm with a result of Refer/Ineligible (meaning it is referred for manual underwriting, and is ineligible for an FHA loan). As indicated in the DU report for A-17, paragraph 4, the case was referred because the lowest median FICO was less than 620 (it was 618) and the debt to income ratio was greater than the maximum of 43%. The loan was further

4

ineligible because Borrower 1 did not have the funds to close, as set forth in A-17, paragraph 6. This DU submission included the following debts:

| Creditor | Balance | Payment |
|---|---|---|
| Carfinance.com | $15,804 | $389 |
| WFDS | $15,213 | $375 |
| CapOne/HLZBG | $1,950 | $49 |
| Blakely Witt & Associates | $1,267 | $63.35 |
| Caine & Weiner | $576 | $28.80 |
| Credit One Bank NA | $400 | $25 |
| TD Bank USA/Target Cred | $395 | $25 |
| SYNCB/Walmart | $355 | $25 |
| Rickman & Rickman | $236 | $12 |

v.   The following accounts were noted as omitted from the Underwriting Analysis. DU requires that documentation be provided to support the omission. No documentation was provided.

| Creditor | Balance | Payment |
|---|---|---|
| Nissan Motors Acceptance | $5,622 | $0 |
| Valarity LLC | $144 | $0 |

vi.   Borrower had a seven-month work history at his employer at the time of application. The file contains no verification of previous employment, nor wages therefrom. Two years of employment and income verifications with W-2s or paystubs are required for approval under HUD 4155.1, 4.D.1 This requirement was disregarded and the loan was approved without the required documentation.

vii.   On November 23, 2014, at 3:53 pm, Casefile A-18 submission was made by DU user 148n2jlm, which resulted in Approved/Ineligible. The loan was ineligible due to inadequate funds to close. Casefile A moved from Refer to Approve because the debt to income ratio was reduced to 42.63%, by removing debts owed to Blakely Witt & Associates, and Caine & Weiner. However, the approval also states those two debts owed must be paid off, with evidence of payoff and source of funds included in the loan

file, required by both DU Report A-18 and HUD 4155.1, 4.C.1.c.  No evidence of payoff or source of funds was included in the file, therefore making this loan ineligible to close due to lack of evidence of payoffs.

viii. Within the next 10 minutes following A-18 submission, A-19 and A-20 were submitted to DU, both by user 148n2jlm, without explanation. Both of these submissions required $13,666 to close, with only $10,936.05 available to borrower, therefore making the loan ineligible under FHA Guidelines.

ix. A few minutes later, on November 23 at 4:03 pm, DU A-21 was submitted by user 148n2jlm, which yielded a finding of Approve/Eligible. The difference between DU A-20 and DU A-21 was that an additional $3,500 USAA checking account is listed as an asset in A-21. This caused the available funds to rise to $14,436.05. There is no documentation of the existence of the second USAA checking account. Submitting false assets to DU is fraud, resulting in a fraudulent approval of the loan.

x. On December 22, 2014, at 11:56 a.m., this loan was once again submitted to DU, by user 148n2mec, but of note was the new casefile ID number assigned (same borrower and same property), ending in 618 (Casefile B). The DU finding for submission B-1 was Refer/Eligible, with the same creditors listed in subsection 6(a)(iv) above, as the debt to income ratio was above the acceptable limit at 45.19%.

xi. Nissan is again not listed as a creditor on the B-1 submission, and there is no evidence of payoff of that loan.  Further, Borrower's assets listed were two checking accounts from USAA as well as a gift which was not documented. A few minutes later, DU B-2 was run, again with the omission of TD Bank USA/Target debt, which yielded an excessive debt to income ratio of 44.66%, and therefore was still referred for manual underwriting.

xii. Approximately five minutes later, DU B-3 was run, this time with debt to Caine & Weiner also removed. This yielded a total expense ratio of 43.32%, which still resulted in a Refer/Eligible finding due to the excessive ratio.

xiii. That same day at 3:00 p.m., DU B-4 was run, wherein Credit One Bank and SYNCB/Walmart debts were removed and Caine & Weiner was reinserted as a creditor. This yielded a total ratio of 42.45% and an

Approve/Eligible finding was issued. However, on January 29, 2015, at 1:01 p.m., DU B-7 was submitted with the same credit entries as B-4, but the assets were changed to reflect a checking account of $11,328.69. The required funds to close were noted to be $10,410 and the available funds were now listed as $11,328.69.

xiv.  Borrower 1's loan closed on February 5, 2015. However, another DU submission, B-9, was run on March 20, 2015, six weeks after it closed. The results of this submission were a finding of Approve/Eligible, with a lower ratio of 40.90% than previously obtained. This was caused by decreased payments to Capital One/HLZBG and Credit One Bank, and the omission of Blakely Witt & Associates, Caine & Weiner and Rickman & Rickman. No evidence of payoff nor source of funds for same was provided to justify the omission. The B-9 submission does include, however, a payment of $25 with a balance of $510 owed to TD Bank USA/Target Cred. Once again, the only asset shown was a checking account in the amount of $11,328.69.

xv.  An examination of Borrower 1's file reveals that there was a THIRD loan casefile opened for DU submission beginning in early January, 2015, using case file ID ending in 320 ("Casefile C"), by DU user 148n2jlm. The first such submission, C-1, used the same creditor information as that submitted under Casefile B on December 22, 2014, at 3:00 p.m. Therefore, it resulted in a finding of Approve/Eligible.

xvi.  The same numbers were again submitted by user 148n2jlm on January 29, 2015, submission C-3, resulting in an Approved/Eligible finding.  On January 30, 2015, submission C-4, by user 148n2jlm, was Refer/Eligible and of note was the inclusion of the Nissan debt of $5,622 in collections, although this debt was excluded from the Underwriting Analysis. No explanation was made justifying the exclusion of the Nissan debt, which is required by HUD 4155.1, 4.C.4.b and 4.C.2.d, which state in part:

> Collection Accounts and Judgments Applicable to Manually Underwritten Loans: The lender must document reasons for approving a mortgage when the borrower has collection accounts or judgments. Regardless of the amount of outstanding collection accounts or judgments, the lender must determine if the collection account or judgment was a result of: the borrower's disregard for financial obligations; the borrower's inability to manage debt; or extenuating circumstances. The borrower must provide a letter of

> explanation with supporting documentation for each outstanding collection account and judgment. The explanation and supporting documentation must be consistent with other credit information in the file.

xvii. DU C-5 was submitted by user 148n2jlm on January 30, 2015 at 10:44 a.m. This report showed a Refer finding based upon lack of a credit score. The expense ratio dropped to 40.90% using the numbers that were used in submission 9 under Casefile B. On January 30, 2015 at 10:58 a.m., C-6 was submitted to DU by user 148n2jlm, with an Approved/Eligible finding. The total ratio was 41.43%. This was achieved by omitting debts owed to Blakely Witt & Associates, Caine & Weiner, Rickman & Rickman, and Nissan Motor. However, no reason was provided for those exclusions, which is again in violation of HUD 4155.1, 4.C.4.b and Carrington Credit Processing Requirement, Vol. 1.3, p. 93.

xviii. A few minutes later at 11:00 a.m., this loan was again submitted to DU by user 148n2jlm, but using Casefile 618 (B-8), and also received an Approve/Eligible finding. This time, the debt to income ratio was 42.45%. In calculating this amount, debt from Capital One/HLZBG, Blakely & Witt, Caine & Weiner, Rickman & Rickman were included. TD Bank USA/Target Cred was listed but excluded from the calculation with no explanation. SYNCB/Walmart was not listed, nor was Nissan. However, no reason was provided for those exclusions, which is again in violation of HUD 4155.1, 4.C.4.b and 4.C.2.d, and Carrington Credit Processing Requirement, Vol. 1.3, p. 93.

xix. On January 29, 2015, the Carrington underwriter with CHUMS ID Bf49 approved this loan for transmittal to HUD. No comments were made on the transmittal by the underwriter.

xx. This loan closed on February 5, 2015. The Uniform Residential Loan Application lists liquid assets of $22,328.69 by crediting the $10,000 gift twice (once on its own and once as part of the account total), which is wholly inaccurate. This application also omits the debts owed to Nissan Motor and Caine & Weiner. Although the files seemingly document that the down payment was a result of a $10,000 gift, and the earnest money was a $1,000 gift, there are no gift letters for this file, which violates HUD 4155.1 5.B.5.a.

8

xxi. On Carrington's November 23, 2014 submission result (A-21), submitted by user 148n2jlm, conditions for loan approval were listed. Those conditions required documentation that the collections for $1,267 and $576 were paid off, of which documentation was not provided.

xxii. After the loan closed, Borrower made only four payments on the loan, and the loan defaulted with a reason given of "unable to contact borrower." This resulted in claims made on and paid by the U.S. Government in the total amount of $102,948.77 with respect to LOAN 1, which damage is a direct and proximate result of the above listed violation of HUD policy and submission of fraudulent information.

b. **LOAN 2**: On March 21, 2014, Borrower 2 completed a Uniform Residential Loan Application wherein she stated she was unmarried with two children under the age of five, was employed at Buckhead Restaurant for the past 30 months, and had a monthly income of $2,749.

i. She provided information indicating that she had a "Second Chance Checking" account at Bank of Kentucky, and account at Kentucky Federal Savings Bank, jointly totaling $11,155. She listed her debts as:

| Creditor | Amount Owed |
|---|---|
| Federal Loan Services | $3,500 |
| Department of Ed/SLM | $533 |
| Sallie Mae | $204 |

ii. On March 27, 2014, Borrower 2's loan was submitted to DU under Casefile ID ending in 581 (hereinafter "Casefile A"). This submission was apparently in order to obtain "preapproval". The DU findings were Refer/Eligible and reflected a sales price of $100,000. Base income was determined to be $2,749. Assets were listed as $8,628 in checking and $2,027 in savings.

iii. On April 4, 2014, Borrower 2 entered into a sales contract to purchase a home in Florence, Kentucky for $99,800.

iv. The file contains a verification of deposit from Kentucky Federal Savings Bank indicating that on April 29, 2014, there was a balance of $2,027.66.

v. A credit report was completed on March 21, 2014, which showed a credit score of 592. Borrower 2's scores were 559, 592, 607. Borrower 2 had debts of:

1. $6,000 Federal Loan Service, student loan-payment deferred, from February, 2014.
2. $3,500 Federal Loan Serve with student loan-payment deferred, from February, 2014.
3. Online Collections in the amount of $659 with $659 shown as past due, from June, 2012.
4. Department Ed/SLM with a balance of $533, now current, but was 120 days overdue, from February, 2014.
5. Eagle Financial with balance of $377, with $392 past due and noted as charged off account, from February, 2014.
6. University of Phoenix with a balance of $339 with a past due amount of $339, shown as charged off, from March, 2014.
7. Bull City Financials in the amount of $290 with $290 past due in collection, from March, 2014.
8. Sallie Mae with a balance of $204, from February, 2014.
9. Credit Protection (Insight Communications) with balance of $121 and $121 past due in collection, from December of 2010.
10. Columbia House with a balance of $110 and $110 past due in collection, from October, 2011.
11. Credit Solutions LLC with a balance of $95 and $95 past due in collection, from March, 2014.
12. Unique National Coll balance of $70 and past due amount of $70 in collection, from June, 2013.
13. Department of Education Sallie Mae outstanding loans as follows:
    a. $3,000 delinquent 120+ days, from October, 2010.
    b. $1,750 delinquent 120+ days, from October, 2010.
14. First Premier Bank $452 charged off; notation that account sold to Asset Acceptance Corp.

vi. The trade summary of Borrower 2's Credit Report indicates a total of $12,298 in outstanding debt, with $2,076 past due. It further indicates that she had four accounts that were 90 days or more past due.

vii. Borrower 2 provided a letter simply indicating that the Online Collections debts are not her responsibility. She alleges that they are the responsibility of her prior companion. Borrower 2 also disputes the Columbia House and Eagle Financial Services accounts. Finally, she stated that the Insight

10

account was a result of her prior companion using her information. None of these denials were verified by the underwriter, as required by HUD 4155.1 4.C.1.c, nor is there an explanation as to why Borrower 2, even with the explanation given, would not be obligated for the debts.

viii. On April 15, 2014, Carrington Mortgage issued a Notice of Incomplete Application and Request for Additional Information, specifically, Carrington requested two years of 1040s, the two most recent bank statements, and a gift letter if needed. There is no indication that 1040s were supplied. The bank statements provided contradicts the numbers that are eventually submitted for this loan. There is a bank statement that does include a $10,000 credit, presumably from Borrower 2's father. There is a wage statement from Buckhead Mountain Grill for pay date June 2, 2014 which shows total gross $16,275.40. Using just Borrower 2's regular salary, this yields a monthly income of $2,793, plus bonus income of $326. The Underwriter calculated Borrower 2's base income at $2,833. There is no indication that Carrington obtained or reviewed tax returns of Borrower 2. Further, there is no indication that Borrower 2's incomes was verified by w-2s or paystubs for two years, which is required by HUD guideline 4155.1 4.D.1.

ix. This matter was again submitted to DU beginning on June 22, 2014 under a new Casefile ID (ending in 235; herein after "Casefile B"). The submission on June 2, 2014 yielded a Refer/Eligible finding. The Housing Expense Ratio was determined to be 29.89% with a Total Expense Ratio of 31.75%. The underwriter used only the following two liabilities in his assessment:

| Creditors | Balance | Payment |
|---|---|---|
| DPTED/SLM | $533 | $37 |
| Department of Ed/Sallie Mae | $204 | $14 |

x. The underwriter excluded from the underwriting analysis, without explanation, the following:

| Creditors | Balance | Payment |
|---|---|---|
| Fed Loan Serve | $6,000 | $0 |
| Fed Loan Serve | $3500 | $0 |
| Online Collections | $659 | $0 |
| University of Phoenix | $339 | $0 |
| Bull City Financial Solution | $290 | $0 |
| Credit Protection Associates | $121 | $0 |

11

| NATL RACOVER | $110 | $0 |
| Credit Solutions LLC | $95 | $0 |
| Unique National Coll | $70 | $0 |

xi.  At that time the underwriter used $2,749 as Borrower 2's base monthly income. Further, assets of $9,944.34 (gift from father) in the Bank of Kentucky and $2,027 at Kentucky Federal were listed. A gift letter was provided to underwriting, in violation of HUD 4155.1, 5.B.5.a.

xii.  Borrower 2 indicated in her application, and again in a letter of explanation, that she lived rent free with her father.  HUD 4155.1, 4.C.2.b requires that the borrower's 12 months rental history be verified, which would have revealed massive payment shock in going from $0 to $770.67 in total monthly housing expense. Applicants statement is directly contradicted by Carrington Underwriter Aa79 who indicates in the Loan Transmittal that Borrower 2 had been paying the mortgage at her father's home while she lived there.  This intentional misrepresentation of facts is evidence of fraud on the U.S. Government, which resulted in damages thereto.

xiii.  This loan was submitted by user 148n2m7w to DU B-2 on June 10, 2014, which again yielded a Refer/Eligible finding, with debt to income ratios of 29.89% (all debt) and 31.75% (housing).

xiv.  The last DU in the file, submitted by user 148n2m7w was from June 10, 2014, at 11:04 a.m. (B-3), and resulted in a Refer/Eligible with ratios of 29.01% and 30.81%, due to an increase in the base employment income to $2,833.

xv.  This loan was approved, and submitted with FHA Loan Underwriting and Transmittal Summary on June 10, 2014 by underwriter with CHUMS ID Aa79.  The underwriter noted the following strengths:

> 6 months of reserves. Letter of explanation from father explaining that the borrower had been living with him since his wife had passed away and he was on disability. Borrower had to pay his mortgage since he was waiting for disability approval and backpay. That is why borrower was given the $10,000 gift from her father. It was really repaying her for bills that she had paid for him, and probably a little extra. Borrower received a promotion at work in the last 6 months, base pay only to qualify.

12

Although a letter from the father is referenced, no such letter was found in the file. Further, this statement directly contracts Borrower's prior declaration that she was living rent free with her father.

xvi. Borrower 2's first mortgage payment was due August 1, 2014. The first payment was made on July 30. Thereafter, the remaining payments were at least 30 days late, with the exception of a December payment which was only 29 days late. A total of six payments were made, five of which were late, before Borrower 2 stopped making payments. The reason for default provided was curtailment of income, which is consistent with the information the underwriter had in the file and disregarded when he approved the loan. This mortgage foreclosed and a claim was submitted to the U.S. Government, with payments to Carrington to date of $50,284.88. Payment was made in November, and additional claims on this mortgage may still be outstanding at the time of this filing.

c. **LOAN 3:** On March 1, 2014, Borrower 3 entered into a contract to buy a house located in Bonaire, Georgia for $106,000.

i. Prior to entering into the contract, Borrower 3 contacted Carrington about obtaining a mortgage. A credit report was requested on February 20, 2014. Borrower 3 had previously contacted Quicken Mortgages who ran a credit report on February 9, 2014.

ii. A credit report was received by Carrington on March 20, 2014. Borrower 3's credit score was 582, very poor. His credit history showed open accounts/debt with Hyundai, and ENHANCRCVRCO and XLACCELRECVM, which are collection agencies. Although Borrower 3 had recently purchased an automobile from Honda using credit, as indicated on his April 11, 2014 letter of explanation to Carrington, there was no debt entry for that auto loan.

iii. The first Uniform Residential Loan Application in the file completed by Borrower 3 was dated April 4, 2014, five weeks after Borrower 3 entered in the contract. he represented that his current job of three months was at O'Charley's Inc. where he worked as a kitchen manager with monthly income of $4,166.66. He also represented that his previous employment was at NBC Universal from March 14, 2003, until October 25, 2013, with monthly income of $3,220. Borrower 3 also represented that he was unmarried and had no dependents. He was paying rent in the amount of

$750 per month at the time of application. He listed assets of $1,000 in earnest money, $9 in a Bank of America account, $1,150 in a second Bank of America account, and a gift in the amount of $6,000. Additionally, he represented owning a 2013 Hyundai Elantra and a 2012 Honda Civic for total assets of $52,159. Borrower 3 lists his liabilities as:

| Lender | Monthly Payment | Unpaid Balance |
|---|---|---|
| Hyundai Finc | $335/month | $13,766 |
| ENHANCRCVRCO | $0/month | $790 |
| ACCELRECVM | $0/month | $455 |
| FST Premier | $9/month | $451 |

iv. Although Borrower 3 represented that he has no dependents, his tax returns reviewed by the underwriter clearly contradict this representation and state he has a dependent and is claiming same as a tax deduction.

v. Carrington completed an income calculation worksheet, based on Borrower 3's income using tax returns, which showed 2013 income of $16,291.72 and 2012 income of $7,017. Borrower 3 had, however, earned $12,450.39 in the first quarter of 2014. Carrington adjusted Borrower 3's income to $3,750.07 per month based upon verification from O'Charley's of a yearly salary of $45,000.

vi. On April 17, 2014, Borrower 3 wrote to Carrington to explain his negative credit. He denied having accounts with Time Warner Cable or Stratford Career Institute. He also denied having an account with First Premier Bank. None of these denials were verified by the underwriter, as required by HUD 4155.1, 4.C.1.c.

vii. On April 21, 2014, Borrower 3 wrote to Carrington and indicated that he was currently living with his fiancé and her family, and was not required to pay rent, which contradicts his Application statement indicating he was paying $750 per month in rent. Further, he represented that while he was living in California, he lived with his father. HUD 4155.1, 4.C.2.b requires that the borrower's 12 months rental history be verified, which would have revealed massive payment shock in going from $0 to $817.57 in total monthly housing expense on his new mortgage, which total is shown on the closing paperwork for this loan.

viii. While working at NBC Universal, he made $11 to $12 an hour and was going to school. This also contradicts his Application statement which

14

indicates he was making $3,200 monthly at NBC, as, even at full time, $12 an hour would total only $1,920 per month. Carrington submitted this loan to DU 14 times. The 14th submission, made by user 148n2rxp, occurred on April 25, 2014 (none of the first 13 submissions are included in the file), with a finding of Refer/Eligible. The liabilities listed for Borrower 3 were:

| Creditor | Balance | Payment |
|---|---|---|
| Hyundai Finc | $13,766 | $335 |
| GECRB/Care Credit | $700 | $25 |
| American Honda Finance | $10,618 | $232 |

ix. The entry for GECRB/Care Credit contradicts Borrower 3's statement of April 11, 2014, on his letter of explanation, wherein he indicates that the only credit established as a result of credit inquiries in January/February 2014 were for purchase of a Honda. Rather, it appears that there was a revolving charge that was instituted in February of 2014. We note that on April 17, 2014, Borrower 3 wrote on his letter of explanation that he never had a credit card from First Premier Bank or anyone else: "I have never had a credit card because I don't desire to have one." Nevertheless, a credit card was included on his credit report, and was utilized as part of the DU.

x. On April 25, 2014, Carrington Underwriter GA38 completed an FHA Loan Underwriting and Transmittal Summary approving this loan. The underwriter commented:

> AUS offering is Refer/Eligible, loan has been manually underwritten 585 FICO was not indicative of borrower's credit profile. He has open positive credit. His adverse credit consists of paid collections of $625, charge off $451 and two open collections ($1,245 total), all aged. Borrower received doctorate in Food Service Restaurant Management in 2013, relocated from CA to GA and is now employed as kitchen manager at a large chain restaurant with solid steady income. Borrower has received home ownership education. Compensating factor-borrower is putting down larger down payment (full 5%).

xi. The approval of this loan based on false information is fraud and is not supported by the documentation in the file. Borrower 3's credit score was extremely low, at 582. The underwriter discredited Borrower 3's statement that he never had a credit card in the past, nor that he had not obtained

15

credit from ENHANCECRCO or XLRECVM, as the underwriter included these as aged open collections in the submission. These collections were reported in August 2012 and December 2013 respectively. While it is true that Borrower 3 did receive a degree in food service restaurant management, his employment at O'Charley's was for a duration of only three months, as evidenced by the income calculation worksheet. Further, the employment verification from Universal Studios and his tax records do not show income of $3,200 per month, as represented on Borrower 3's loan application. Rather, Borrower 3 is described as an on-call employee for Universal Studios. There is no documentation of Home Ownership Education in the materials. Most importantly, the underwriter lists "a compensating factor" of the borrower putting down a larger down payment (full 5%). Pursuant to HUD 4155.1, 4.F.3.b, an "increased compensating factor" is to be used when a borrower makes a large down payment of ***10% or higher*** towards the purchase of the property." Emphasis added.  In this case, Borrower 3 was seeking a loan of $102,385 for a home with a sales price of $106,000, therefore making the down payment only 3.4% of the purchase price, and not qualifying as a compensating factor, and falling well below the 5% reported by the underwriter.

xii.   Borrower 3 made seven payments on this loan before it defaulted, with one of those payments having been returned for insufficient funds. The reason given for the default was "unable to contact borrower."  This resulted in claims against HUD in the amount of $8,471.95 in costs associated with foreclosure, in addition to an unknown amount for the loss on the house as said documentation is missing from the file.

d.   **LOAN 4:**   On January 9, 2015, Borrower 4 completed a Uniform Residential Loan Application with Carrington for an FHA Mortgage refinance of her primary residence located in Savannah, Georgia. The current loan on this property was held by Carrington in her and her ex-husband's names. The application was for a FHA Streamline Non-credit Qualifying Mortgage.

i.   On January 6, 2015, three days prior to her application, Borrower 4's ex-husband quitclaimed his interest in the property to Borrower 4.

ii.   In the Commitment for Title Insurance, completed February 23, 2015, First American Title Insurance Company found that the property was owned by borrower and her ex-husband as joint tenants with rights of

survivorship, therefore evidencing that the quitclaim deed signed on January 6, 2015, was not recorded, and therefore ineffective.

iii. Borrower 4's Streamline non-credit qualifying refinanced loan was approved and closed on February 28, 2015. This loan not only refinanced the mortgage, but also removed Borrower 4's ex-husband from responsibility for the mortgage. The closing date for the refinance was at most 53 days after the execution of the quitclaim deed. Given that the title company determined on February 23, 2015, that ownership of the property remained vested in both the Borrower 4 and her ex-husband, it appears that the removal of a borrower occurred without any valid transfer of the co-borrower's interest. According to HUD 4155.1,6.C.2.d: a borrower may be deleted from the title on a streamline refinance only under certain circumstances, one of which applies to divorce, if all requirements are met:

> Following an assumption of a mortgage in which the transferability restriction (due-on-sale-clause) was not triggered, such as in a property transfer that resulted from a divorce decree or by devise or descent, and the assumption or quitclaim of interest *occurred more than 6 months previously* and the remaining owner-occupant can demonstrate that he or she has made the mortgage payments during this time.

Emphasis added.   In the event that the requirements of HUD 4155.1,6.C.2.d are not met, then the refinance would be subject to credit qualification for the remaining owner

iv. Carrington underwriter Hg20 completely disregarded HUD regulations and approved this loan based on fraudulent information and without credit qualification.  The quitclaim was signed, but not recorded, much less than six month before the loan approval.  Further, the file materials clearly indicate that Borrower 4 was independently an unacceptable credit risk and did not qualify for an FHA loan following her divorce. Specifically, the borrower was self-employed with an erratic stream of income.

v. Borrower 4's bank statements reviewed by the underwriter establish a consistent pattern of decreasing balance beginning in July 2014.

vi. The December, 2014 bank statement, which was provided to the Carrington underwriter, demonstrates that Borrower 4 had significant

17

credit card debt, including payments to Shell, Capital One, Fuel Rewards Network MasterCard, Synchrony Bank, Wells Fargo Cards Services, Kohls, GE Capital Retail Bank, and Lowes. Further, there was evidence of a number of overdraft advances from several small savings accounts at Capital One to Borrower 4's checking account. Finally, the checking account statement shows that the borrower's December mortgage payment failed to clear until January 2, 2015, more than 30 days after its due date. A cursory review of this applicant's file reveals that she was not qualified to be a sole debtor on this property, and the closing of this loan removed the existing income stream of ex-husband, therefore leading to the obvious result of default of the mortgage.

vii.   On January 8, 2015, as part of the refinance process, Carrington issued a letter to Borrower 4 indicating that her application was incomplete. Specifically, Carrington requested that Borrower 4 submit the previous two years forms 1040, 1120, and K1, her two most recent bank statements, and her hazard insurance declaration page. There is no evidence that the 1040s, 1120s or K1s were submitted. The borrower did sign a release of her tax returns; however, this release was not signed until the day of closing, February 28, 2015, therefore indicating that Carrington approved the loan without review of said returns.

viii.   The first date for which payment was due on the refinanced mortgage was May 1, 2015. Borrower made her first payment on May 15, 2015. Borrower's second payment was due on June 1, 2015, but was not made until two months later, on July 30, 2015. No payments were made by borrower after this second payment on July 30.

ix.   This matter resulted in a claim against the U.S. Government in the amount of $49,462.04. The Single-Family Application for Insurance Benefits claim form was completed by Carrington on March 7, 2017. The reason for the default was excessive obligations, same income, including habitual non-payment of debts. According to the HUD Guidance for Usage, this category is to be used when a delinquency is attributable to the borrower having incurred excessive debts (either in a single instance or as a matter of habit) that prevent them from making payments on both those debts and the mortgage debt. This Borrower's situation was clear from the documents reviewed by the underwriter that this loan should not have been approved, and approving same was fraud on the U.S. Government for it to insure a loan that was sure to fail.

18

     x.  Due to the use of the streamline noncredit qualifying refinance, which was on its face an improper way to push a debt-plagued low-income borrower through to close, this loan defaulted and the U.S. Government was damaged.

7.    Carrington, by, through, and dictated by its employees (including, but not limited to, Jim Sims, Jeremy Milner, Leslie White, Scott Woodard, Raymond Brousseau, Lisa Pratt, Cassandra Miller, Rich Marfino, Bruce Rose and Jeff Gillis) nevertheless certified that all of the loans that it approved for government insurance or refinancing met all of the underwriting requirements applicable to FHA loans.  These false certifications misled HUD into believing that thousands of loans had been properly underwritten and were eligible for government insurance or refinancing when, in fact, the loans were high-risk and did not qualify for such insurance or refinancing.  Based on these false certifications, HUD accepted thousands of loans for government insurance or refinancing that they otherwise would not have accepted for such insurance or refinancing.  When these deficient loans ultimately defaulted, HUD, which had insured the loans against default based on Carrington's false certifications, was left to cover the losses. See Paragraph 6 above for specific examples of same.

8.    Furthermore, Carrington, by, through, and dictated by its employees (including, but not limited to, Jim Sims, Jeremy Milner, Leslie White, Scott Woodard, Raymond Brousseau, Lisa Pratt, Cassandra Miller, Rich Marfino, Bruce Rose and Jeff Gillis), and on a nearly daily basis, has been manipulating TOTAL Mortgage Scorecard ("TOTAL") - a credit-rating algorithm maintained by the FHA that works in conjunction with Carrington's automated underwriting system ("AUS") - to obtain "accept/approve" ratings for its FHA loans, in violation of HUD rules.  TOTAL rates loans as either "accept/approve" or "refer" based on data points that Carrington enters into its AUS, including, for example, the dollar value of the borrowers' income

and assets.  Loans that receive an "accept/approve" rating are subject to less stringent documentation requirements and underwriter scrutiny than loans that receive a "refer" rating. During the Covered Period, if Carrington ran a loan through its AUS and the loan did not receive an "accept/approve" rating from TOTAL, Carrington frequently: (l) re-ran the loan through its AUS/TOTAL multiple times over a short period, each time entering into the AUS/TOTAL hypothetical data points that lacked a factual basis, to determine the data point values that would result in an "accept/approve" rating; and then (2) communicated the qualifying data point values to the borrower or broker, thus recklessly increasing the risk of borrower fraud.  See Paragraph 6 above for specific examples of same.

9.      Finally, during the Covered Period, Carrington, by, through, and dictated by its employees (including, but not limited to, Jim Sims, Jeremy Milner, Leslie White, Scott Woodard, Raymond Brousseau, Lisa Pratt, Cassandra Miller, Rich Marfino, Bruce Rose and Jeff Gillis), repeatedly violated HUD's self-reporting requirement and kept a substantial number of its deficient loans a secret.  Specifically, as an example, Carrington, by, through, and dictated by its employees (including, but not limited to, Jim Sims, Jeremy Milner, Leslie White, Scott Woodard, Raymond Brousseau, Lisa Pratt, Cassandra Miller, Rich Marfino, Bruce Rose and Jeff Gillis), would direct its employees to ignore the HUD requirement that, upon denial of a loan by an underwriter, the denial was to be entered into the Connection as a denied loan, therefore creating a red flag on that application. A specific example of the many times this HUD requirement was violated occurred when Lisa Pratt, Underwriting Manager, specifically directed Relator on October 19, 2013, to NOT report the denial in FHA Connection, even though the loan had been denied three times under the following loan numbers: 400505350, 400506874, and 400507776.  Further, Jeff Gillis, a member of Defendant's Senior Management, held a meeting

in the Fishers, Indiana, office in 2014, wherein he directed the underwriters in that office to NOT report denials in FHA Connection. Carrington knew that HUD rules required it to perform quality control reviews on a subset of the loans it had approved for FHA insurance, and to self-report to HUD any loans that it identified as having been affected by fraud or other serious violations. This self-reporting requirement was meant to enable HUD to investigate bad loans and to request reimbursement or indemnification from lenders, as appropriate. Carrington, however, repeatedly failed to comply with the self-reporting requirement, thus concealing from HUD many of its bad loans and questionable underwriting practices. See Paragraph 6 above for specific examples of same.

10.     Additionally, when an FHA loan closes, the lender has 30 days to submit the loan for mortgage insurance certification. In late 2014 and early 2015, during the end of Relator's tenure with Defendant, Ray Brousseau directed nearly all of the underwriters, processors and closers of Carrington to focus all efforts to help get thousands of closed FHA loans properly insured. Many of these loans had been closed for many months, and some over a year, without Carrington having submitted them to FHA for mortgage insurance coverage. Therefore, the borrowers were paying Carrington mortgage insurance premiums, when in fact their mortgages were not insured. This substantial violation was not reported to FHA and the mortgage insurance premiums collected by Carrington were not returned to the borrowers. This activity evidences fraud on behalf of Carrington, and a lack of self-reporting and following required FHA guidelines.

### III.     PARTIES

11.     Plaintiff/Relator Michelle Calderon is a resident of Carmel, Indiana, and is a former employee of Carrington Mortgage Services, LLC. In March 2013, Calderon joined

Carrington as an underwriter in its Fishers, Indiana office.  Relator has provided the government with information and documents in accordance with 31 U.S.C. §3730(b)(2).  Relator is an original source of this information, and this Complaint is not based upon publicly disclosed information.

12.     Defendant Carrington Mortgage Services, LLC is organized under the laws of the State of California, with a principal place of business in Santa Ana, California.  Carrington operates various operations centers that provide mortgage loan servicing.  Carrington has been approving loans for insurance and refinancing by the FHA company-wide since 2007, and in Indiana since at least March of 2013.

IV.     FACTUAL BACKGROUND

**1.     HUD's Direct Endorsement Lender Program.**

       A.     <u>Background</u>.

13.     The FHA, a part of HUD (and included within the term "HUD" for purposes of this Complaint), is the largest insurer of residential mortgage loans in the world. Pursuant to the National Housing Act of 1934, HUD offers various mortgage insurance programs.  Through these programs, the FHA insures approved lenders ("mortgagees" or "Direct Endorsement Lenders") against losses on mortgage loans made to buyers of single-family homes.

14.     Under HUD's mortgage insurance programs, if a homeowner defaults on an FHA insured loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property.  By protecting mortgage holders against defaults on mortgages, FHA mortgage insurance encourages lenders to make loans to millions of creditworthy Americans who might not qualify for loans under conventional underwriting criteria.  FHA mortgage insurance also makes mortgage loans

22

valuable in the secondary markets, as FHA loans are expected to have met HUD underwriting requirements and because they are secured by the full faith and credit of the United States.

15.     HUD's Direct Endorsement Lender program is one of HUD's mortgage insurance programs. Under this program, an approved lender *(i.e.,* a Direct Endorsement Lender) is authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for HUD, and certify loans for FHA mortgage insurance without prior review or approval of the loans by the FHA or HUD.  Direct Endorsement Lenders are private entities, such as banks and mortgage companies.

16.     To qualify for FHA mortgage insurance, a mortgage must meet all of the applicable HUD underwriting requirements.  These underwriting requirements relate to, among other things, the adequacy of the borrower's income and assets to meet his or her mortgage payments and the borrower's credit history.

17.     HUD relies on the experience and expertise of Direct Endorsement Lenders in approving loans for FHA insurance. HUD expects Direct Endorsement Lenders to determine whether borrowers represent an acceptable credit risk for HUD.  Direct Endorsement Lenders are therefore obligated to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in their dealings with HUD.  The duty of good faith also requires all Direct Endorsement Lenders to make full and fair disclosures to HUD of all material facts and to take on the affirmative duty of employing reasonable care to avoid misleading HUD in all circumstances.

B.     <u>HUD Underwriting Due Diligence Requirements</u>.

18.     Direct Endorsement Lenders are responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the loan. Direct Endorsement Lenders must employ underwriters to "evaluate [each] mortgagor's credit characteristics, [the] adequacy

and stability of [the mortgagor's] income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.S(d).

19.     Direct Endorsement Lenders must also ensure that their underwriters: (l) are capable of detecting fraud, as well as warning signs that may be indicators of fraud; and (2) exercise due diligence in making underwriting decisions. HUD 4000.4, 2-4(C)(5); HUD 4155.2, 2.A.4.b.

20.     HUD relies on Direct Endorsement Lenders to conduct due diligence on all loans before approving them for FHA insurance.  To satisfy this due diligence requirement, Direct Endorsement Lenders must: (1) evaluate each borrower's ability and willingness to repay the mortgage debt *(i.e.,* conduct a credit analysis), to limit the possibility of default and collection difficulties, *see* 24 C.F.R. § 203.5(d); and (2) examine the property offered as security for the loan to determine if it provides sufficient collateral *(i.e.,* conduct an analysis of the subject property), *see* 24 C.F.R. § 203.5(e)(3).  The due diligence requirement thus requires an evaluation of, among other things, a borrower's credit history, income, assets, and collateral.  In all cases, each Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R. § 203.5(c).

21.     HUD has set specific rules for due diligence predicated on sound underwriting principles.  In particular, HUD requires Direct Endorsement Lenders to comply with all governing HUD Handbooks and Mortgagee Letters, which set forth the underwriting

requirements applicable to Direct Endorsement Lenders. These materials specify the minimum due diligence requirements with which Direct Endorsement Lenders must comply in endorsing loans for FHA insurance.

22.     HUD requires initial rejections to be reported in the AUS system, through FHA Connection, to put HUD on notice of prior failed applications.

23.     In conducting the required credit analysis for a loan, the Direct Endorsement Lender must evaluate the borrower's credit in accordance with all governing HUD Handbooks Mortgagee Letters and Guidelines, such as HUD Handbook 4155.1, *Mortgage Credit Analysis for Mortgage Insurance*. The rules set forth in HUD Handbook 4155.1 exist to ensure that each Direct Endorsement Lender sufficiently evaluates whether each borrower has the ability and willingness to repay the mortgage debt. HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

C.     Underwriting Loans Using an AUS/TOTAL.

24.     Underwriters employed by Direct Endorsement Lenders may underwrite loans one of two ways: (1) manually, or (2) by using a HUD-approved automated underwriting system. See Paragraph 6 above for specific examples of same.

25.     All HUD-approved AUSs interface with, and operate in conjunction with, a credit-evaluating algorithm maintained by the FHA called *Technology Open to Approved Lenders* ("TOTAL") Mortgage Scorecard. When a loan is underwritten using an AUS/TOTAL, the Direct Endorsement Lender enters various credit variables into the AUS, such as the dollar amount of the borrower's monthly income and available assets, and then, based on those variables, TOTAL evaluates the borrower's overall credit and assigns the loan a rating. This

rating indicates the level of underwriting that must be performed on the loan.  See Paragraph 6 above for specific examples of same.

26.     If TOTAL concludes that a borrower's credit is acceptable, it assigns the loan an "accept/approve" rating, which means that the loan may be underwritten with less stringent documentation requirements and without the underwriter having to fully evaluate the borrower's creditworthiness.  By contrast, if TOTAL concludes that a borrower's credit requires further analysis, it assigns the loan a "refer" rating, in which case the loan must be manually underwritten and is subject to more stringent documentation requirements and underwriter scrutiny.  See Paragraph 6 above for specific examples of same.

27.     For loans that are underwritten manually (*i.e.,* not using an AUS/TOTAL), Direct Endorsement Lenders must, among other things, analyze credit histories, analyze debt obligations, calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules, and consider and document any compensating factors permitting deviations from the fixed ratios.  These requirements do not apply to loans that receive an "accept/approve" rating from TOTAL.  See Paragraph 6 above for specific examples of same.

28.     Direct Endorsement Lenders are not permitted to manipulate the information they enter into an AUS/TOTAL to determine what specific variable amounts would result in an "accept/approve" rating.  For example, if a Direct Endorsement Lender receives a "refer" rating after entering all relevant data points into an AUS/TOTAL, the lender may not then enter hypothetical income or asset amounts (*i.e.,* income or asset amounts that lack a factual basis) in an effort to determine what level of income or assets would generate an "accept/approve" rating. Rather, as made clear by Mortgagee Letter 05-15 and FHA's TOTAL Mortgage Scorecard User Guide, there must be a factual basis for each variable entered into an AUS/TOTAL. Lenders are

26

not to "willfully manipulate the application variables ... to obtain an accept/approve risk classification."  Mortgagee Letter 05-15.  See Paragraph 6 above for specific examples of same.

29.     The prohibition on entering unsubstantiated data points into AUS/TOTAL exists, among other reasons, to protect against fraud.  For instance, if a Direct Endorsement Lender entered factually unsupported income or asset amounts into an AUS - and thereby determined the precise amount of income or assets necessary to obtain an "accept/approve" rating from TOTAL - the lender could falsify loan documents to state that the borrower possesses the required amount of income or assets.  Similarly, if a Direct Endorsement Lender manipulated an AUS/TOTAL to determine the precise amount of income or assets necessary to obtain an "accept/approve" rating and then communicated that information to the borrower or his or her agent, the borrower could falsify loan documents to state that he or she possesses the required amount of income or assets.  See Paragraph 6 above for specific examples of same.

        D.     HUD Underwriting Rules Governing Refinances.

30.     In addition to approving new loans for FHA insurance, Direct Endorsement Lenders are authorized to approve pre-existing FHA loans for refinancing.  A refinancing generally results in the lowering of the borrower's monthly principal and interest payments.  Direct Endorsement Lenders are paid fees in connection with each pre-existing FHA loan they approve for refinancing.  Direct Endorsement Lenders therefore have a monetary incentive to approve FHA loans for refinancing.

31.     To satisfy the due diligence requirement in connection with refinances, Direct Endorsement Lenders must ensure, among other things, that the borrower qualifies for the refinance avenue chosen, and "[t]he borrower is current on the loan being refinanced for the month due prior to the month in which he/she closes the refinancing, and for the month in which

27

he/she closes the refinancing."  HUD 4155.1, 3.A.1.h; *see also* HUD 4155.1, REV-5, 1-10(E), 1-12(D)(6).  Thus, for example, if a refinancing closes on May 18, the Direct Endorsement Lender must ensure that the borrower made both the April and the May payments at or before the May 18 closing. *See id.*  See Paragraph 6 above for specific examples of same.

      E.    <u>HUD Individual Loan Certifications</u>.

32.    For each loan that a Direct Endorsement Lender approves for FHA insurance or refinancing, the lender must certify that it conducted due diligence to ensure that the endorsed mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A.  For each loan that is underwritten using an AUS/TOTAL, the Direct Endorsement Lender must additionally certify to "the integrity of the data supplied by the lender" to the AUS/TOTAL. *Id.* See Paragraph 6 above for specific examples of same.

33.    Whether a loan is underwritten manually or using an AUS/TOTAL, the Direct Endorsement Lender must further certify as follows: "I, the undersigned, as authorized representative of mortgagee at the time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents.  I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4." *Id.* HUD Handbook 4000.4 requires, among other things, that the mortgage comply "with HUD underwriting requirements as contained in all outstanding HUD handbooks and Mortgagee Letters." HUD 4000.4, Appendix 3.  See Paragraph 6 above for specific examples of same.

34.     Absent a truthful individual loan certification, a Direct Endorsement Lender is not permitted to approve a loan for FHA insurance or refinancing.  See Paragraph 6 above for specific examples of same.

**2.     Since at least March 2013, Carrington has Submitted Hundreds of False Individual Loan Certifications to HUD.**

35.     From at least March 2013 through at least March 2015, Carrington recklessly and fraudulently underwrote numerous FHA loans, and falsely certified to HUD that the loans were eligible for FHA insurance ("government insurance").  During the Covered Period, Carrington also recklessly and fraudulently approved numerous pre-existing FHA loans for refinancing, and falsely certified to HUD that the loans were eligible for refinancing.  As demonstrated above, the loans that Carrington approved for government insurance and refinancing did not suffer from minor or technical defects.  Rather, the defects involved critical aspects of the loans, were apparent from the face of the loan files, and prevented Carrington from reasonably concluding that the loans were eligible for government insurance or refinancing.  Further, often times there would be multiple Casefile IDs assigned to the same loan, apparently to attempt pushing the loans through via different avenues, with no legitimate reason to have created the varying files. See Paragraph 6 above for specific examples of same.  Among the most common defects were Carrington's failure to:

a.     obtain the required financial documentation from the borrowers (such as pay stubs, bank statements, and W-2s);

b.     reconcile inconsistent information in the loan files (such as where the income reflected on a borrower's pay stubs was inconsistent with the income reflected on the borrower's W-2s and tax returns/reports; inconsistent debt and creditors, undocuments gifts, and unverified bank accounts,);

c.     verify the borrowers' employment and rental histories; and

d.     in the case of refinances, confirm that the loans being refinanced were current at the time of closing and that borrower qualified for the approved refinance option.

36. As a result of Carrington's reckless underwriting and false individual loan certifications, Carrington, by, through, and dictated by its employees including, but not limited to, Jim Sims, Jeremy Milner, Leslie White, Scott Woodard, Raymond Brousseau, Lisa Pratt, Cassandra Miller, Mike Lumpkin, Ryan Sears, George Mueller, Rich Marfino, Bruce Rose and Jeff Gillis, and those underwriters identified in paragraph 6, HUD paid claims on thousands of loans that Carrington knew, or should have known, did not meet the applicable HUD underwriting guidelines and, therefore, were ineligible for government insurance or refinancing. See Paragraph 6 above for specific examples of same. The Government has suffered substantial losses in connection with Carrington's claims, in excess of $200,000,000. See Paragraph 6 above for specific examples of same.

A. Carrington Recklessly Underwrote and Approved Hundreds of Loans for Government Insurance or Refinancing.

37. As set forth above, for each loan that Carrington approved for FHA insurance, Carrington was required to certify that it had conducted due diligence to ensure that the loan was "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A. In addition, if Carrington used an AUS/TOTAL in approving a loan for FHA insurance, it also had to certify to "the integrity of the data" that it entered into the AUS/TOTAL. *Id.* See Paragraph 6 above for specific examples of same.

38. For each pre-existing FHA loan that Carrington approved for refinancing, it had to certify that the loan was eligible for refinancing. Specifically, for each such FHA loan, Carrington had to certify, among other things, that the borrower qualified for the chosen refinance avenue, and was current on his or her mortgage payments both for the month in which the refinancing closed and for the prior month. HUD 4155.1, 3.A.l.h; HUD 4155.1, REV-5, ¶¶1-10(E), 1-12(D)(6); Form HUD-92900-A. See Paragraph 6 above for specific examples of same.

30

39.     Notwithstanding the above certifications, throughout the Covered Period, Carrington, by, through, and dictated by its employees including, but not limited to, Jim Sims, Jeremy Milner, Leslie White, Scott Woodard, Raymond Brousseau, Lisa Pratt, Cassandra Miller, Mike Lumpkin,  Ryan Sears, George Mueller, Rich Marfino, Bruce Rose, Jeff Gillis, and the underwriters set forth in Paragraph 6 above, routinely failed to conduct the required due diligence on the loans it approved for government insurance and refinancing.  Thousands of these loans contained at least one material violation of the applicable HUD underwriting guidelines, and many of the loans contained two or more such violations.  Moreover, the violations were not difficult to detect; rather, they were apparent from the face of the documents in the loan files.  See Paragraph 6 above for specific examples of same.  Any reasonably diligent underwriter should have noticed the violations in underwriting the loans, and any reasonably diligent quality control personnel should have uncovered the violations while conducting the mandatory quality control reviews of Carrington's closed loan files.  Accordingly, Carrington knew, or should have known, that a substantial number of the loans that it approved for government insurance and refinancing contained unacceptable risk and did not qualify for such insurance or refinancing.

40.     Furthermore, in violation of the additional certification applicable to FHA loans underwritten using an AUS/TOTAL, Carrington, by, through, and at the direction of, including but not limited to, Jim Sims, Jeremy Milner, Leslie White, Scott Woodard, Raymond Brousseau, Lisa Pratt, Cassandra Miller, Mike Lumpkin, Ryan Sears, George Mueller, Rich Marfino, Bruce Rose and Jeff Gillis, and the underwriters set forth in Paragraph 6 above, entered data into its AUS/TOTAL that lacked integrity.  Specifically, when loans did not receive an "accept/approve" rating from TOTAL, many Carrington loan officers and/or underwriters resubmitted the loans to

TOTAL multiple times over a short period, each time entering into Carrington's AUS hypothetical data points that lacked a factual basis in order to determine the data point values that would generate an "accept/approve" rating. This violation was occurring on a nearly daily basis. Many of these employees then communicated the qualifying data point values to the borrowers or their agents, thus inviting borrower fraud. By telling the borrowers the precise data point values that would qualify them for an FHA loan, Carrington provided the borrowers with the information they needed to create and submit fraudulent loan documents. Carrington also gave the borrowers an incentive to submit fraudulent documents; the borrowers knew that if they submitted fraudulent documents reflecting the qualifying data point values, they would qualify for an FHA loan. See Paragraph 6 above for specific examples of same.

41.    In addition to recklessly approving loans for FHA insurance in obvious violation of HUD's underwriting guidelines, many Carrington employees, by, through, and at the direction of  Jim Sims, Jeremy Milner, Leslie White, Scott Woodard, Raymond Brousseau, Lisa Pratt, Cassandra Miller, Mike Lumpkin, Ryan Sears, George Mueller, Rich Marfino, Bruce Rose and Jeff Gillis, and the underwriters set for in Paragraph 6 above, systematically manipulated the data they entered into Carrington's AUS to determine the variable amounts that would generate "accept/approve" ratings from TOTAL. For instance, if TOTAL did not approve a loan with lender income of $50,000, the employees would submit fictitious income for that borrower numerous times until they came up with an "accept/approve" in the system. If that borrower came up with "accept/approve" with income of fictitious "58,000", the employee would then report back to the broker or applicant that they needed to show additional income of $8,000, which would then often times miraculously appear. See Paragraph 6 above for specific examples of same.

42.     When a Carrington employee initially ran a loan through the its AUS/TOTAL, he or she would enter variable amounts consistent with the borrower's representations and/or the documents in the loan file.   However, if a loan received a "refer" rating, many Carrington employees would isolate one or more variables *(e.g.,* the borrower's assets and/or income or debt) and slightly yet systematically increase or decrease the variable(s) during successive AUS/TOTAL runs over a short period of time to identify the variable amount(s) that would result in an "accept/approve" rating. After identifying the qualifying variable amount(s), many of these employees would then communicate that information to the borrower or his or her agent, thus inviting the borrower to create and submit fraudulent documents reflecting the qualifying variable amount(s). See Paragraph 6 above for specific examples of same.

43.     In short, during the Covered Period, Carrington, by, through, and at the direction of, including but not limited to, Jim Sims, Jeremy Milner, Leslie White, Scott Woodard, Raymond Brousseau, Lisa Pratt, Cassandra Miller, Mike Lumpkin, Ryan Sears, George Mueller, Rich Marfino, Bruce Rose and Jeff Gillis, and the underwriters set forth in Paragraph 6 above, engaged in reckless underwriting practices, and falsely certified that thousands of loans were eligible for government insurance or refinancing when they were not.   As a result of Carrington's false certifications, upon information and belief, the United States has suffered substantial losses in connection with claims that HUD has paid on defaulted mortgage loans that were not eligible for government insurance or refinancing. See Paragraph 6 above for specific examples of same.

## COUNT I

**Violations of the False Claims Act; Presenting or Causing False Claims to be Presented**
**(Reckless Underwriting)**
**(31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. 3729(a)(1)(A))**

44.     Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

45.     Relator seeks relief against Carrington under Section 3729(a)(1) of the FCA, 31 U.S.C. §3729(a)(1) (2006), and, as amended, Section 3729(a)(1)(A) of the FCA, 31 U.S.C. §3729(a)(l)(A).

46.     As set forth above, during the Covered Period, Carrington, by, through, and dictated by its employees, including, but not limited to, Jim Sims, Jeremy Milner, Leslie White, Scott Woodard, Raymond Brousseau, Lisa Pratt, Cassandra Miller, Mike Lumpkin, Ryan Sears, George Mueller, Rich Marfino, Bruce Rose and Jeff Gillis, and the underwriters set forth in Paragraph 6 above, knew, or should have known, that it was regularly approving for government insurance and refinancing a substantial number of loans that were not eligible for such insurance or refinancing.  Nonetheless, Carrington certified that its entire portfolio of FHA loans was eligible for government insurance or refinancing, and thereby falsely certified that numerous FHA loans were eligible for insurance or refinancing when they were not.  See Paragraph 6 above for specific examples of same.

47.     Carrington, by, through, and dictated by its employees, including, but not limited to, Jim Sims, Jeremy Milner, Leslie White, Scott Woodard, Raymond Brousseau, Lisa Pratt, Cassandra Miller, Mike Lumpkin, Ryan Sears, George Mueller, Rich Marfino, Bruce Rose and Jeff Gillis, knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented or caused to be presented false or fraudulent claims for payment or approval. Carrington did so by, among other things, submitting false individual loan certifications to HUD, which prompted HUD to accept loans for government insurance and refinancing that did not qualify for such insurance or refinancing. See Paragraph 6 above for specific examples of same.

48.     The U.S. Government has paid claims, and incurred losses, on FHA loans because Carrington falsely certified that they were eligible for government insurance or refinancing. See Paragraph 6 above for specific examples of same.

49.     By reason of the foregoing, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

## COUNT II

**Violations of the False Claims Act; Use of False Statements in Support of False Claims (Reckless Underwriting)**
**(31 U.S.C. § 3729(a)(2) (2006), and, as amended, 31 U.S.C. 3729(a)(1)(B))**

50.     The Relator incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

51.     The Relator, on behalf of the Government, seeks relief against Carrington under Section 3729(a)(2) of the FCA, 31 U.S.C. § 3729(a)(2) (2006), and, as amended, Section 3729(a)(l)(B) of the FCA, 31 U.S.C. § 3729(a)(l )(B).

52.     As set forth above, during the Covered Period, Carrington knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims in connection with numerous FHA loans that Carrington falsely certified were eligible for government insurance or refinancing. Specifically, during the Covered Period, Carrington submitted numerous false individual loan certifications to HUD representing, among other things, that each loan was eligible for government insurance or refinancing. See Paragraph 6 above for specific examples of same.

35

53.     The U.S. Government has paid claims, and incurred losses, on FHA loans because Carrington falsely certified that they were eligible for government insurance or refinancing.  See Paragraph 6 above for specific examples of same.

54.     By reason of the foregoing, the U.S. Government has been damaged in a substantial amount to be determined at trial, and is entitled to treble damages and a civil penalty as required by law for each violation.

Dated: January 31, 2018

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

*/s/ Jennifer L. Blackwell*

Jennifer L. Blackwell, Atty No:  19269-49
Donald G. Orzeske, Atty No: 10362-49

ORZESKE - BLACKWELL, P.C.
50 East 91st Street, Suite 104
Indianapolis, IN  46236
317-846-4000
317-846-8000 (f)
jblackwell@indylitigation.com
dorzeske@indylitigation.com

Counsel for Plaintiff,
United States of America ex rel. Michelle Calderon

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 31st day of January, 2018, a copy of the foregoing was filed electronically using the CM/ECF system and is available to all counsel of record using same.

*/s/ Jennifer L. Blackwell*

Jennifer L. Blackwell