## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. MICHELLE CALDERON, | ) ) ) | 1:16-cv-00920-RLY-MJD |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| CARRINGTON MORTGAGE SERVICES, LLC, | ) ) ) | |
| Defendant. | ) ) | |

_____ )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

Comes now Plaintiff, United States of America ex rel. Michelle Calderon ("Relator"), by counsel, and hereby responds to Defendant's Motion to Dismiss Second Amended Complaint.

## I. FEDERAL RULE OF CIVIL PROCEDURE 9(b) SPECIFICITY REQUIREMENT

Plaintiff's Second Amended Complaint ("SAC") is brought under the False Claims Act ("FCA"), in response to which Defendant has filed a motion to dismiss.  The purpose of the FCA is to encourage private individuals who are aware of fraud being perpetrated against the government to bring such information forward. Ragsdale v. Rubbermaid, 193 F.3d 1235, 1237 (11th Cir. 1999). The Court evaluates all facts in the light most favorable to nonmovants. See Fanslow v. Chi. Mfg. Ctr., Inc., 384 F.3d 469, 478 (7th Cir. 2004). Plaintiff need not prove her case with the allegations and facts set forth in her complaint, she just must provide information sufficient for Defendant to form a defense.  United States ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849, 955 (7th Cir. 2009).

Rule 9(b) generally requires counts based in fraud to state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.  Fed. R. Civ. P. 9(b).  However, there are important fact-sensitive exceptions to this general rule.  To respond to the pending motion, there are certain aspects of the facts, and conclusions being made, that are in need of clarification, specifically, those applicable to the requirements of and application of Federal Rule 9(b) herein. To begin, Plaintiff has previously cited Kennedy v. Aventis Pharmacy, Inc., 512 F. Supp. 2d 1158 (N.D. Ill. 2007) for the proposition that the details linking the particular loan to a particular claim are within the exclusive knowledge of Carrington, therefore creating a scenario that the requirements of Rule 9(b) be relaxed.  The argument that Kennedy is distinguishable from the case at bar, due to the requisite information being held by a third-party, is, respectfully, misplaced.   As is established by the attached affidavit of Relator, Michelle Calderon, Carrington in fact created a segregation of departments within its corporation that systematically prevented underwriters access to any claims information once the files left the underwriting department.  In fact, Carrington, by design, and in an ongoing effort to prevent any one of its employees from having full knowledge of the elaborate fraud scheme, including which loans resulted in claims, created a complete separation of information between its Underwriting and Servicing/Claims Departments.  This is evidenced by the following:

1. Once a file left underwriting, it was assigned a completely different file number, eliminating an underwriter's ability to track the ultimate fate of the loan, a process which has no legitimate purpose other than to block servicing and claims information from the originating underwriters.  Relator has worked at seven mortgage companies and has never experienced this tactic in the industry, other than at Carrington.

2. Underwriters were locked out of the FHA Connection Neighborhood Watch Program by Carrington, which eliminated the underwriter's ability to check the health of the loans they approved, therefore eliminating the underwriters'

access to servicing and claims information, by design. Relator has worked at seven mortgage companies and has never experienced this tactic in the industry, other than at Carrington.

3. Due to Carrington's prohibition of reporting denials into FHA Connection, which violated the HUD Handbook, 4000.1 Sections II.A.1.a.iii.(B)(4)(b) and II.A.5.d.x.(F), underwriters had no way to track whether the loans they denied got reassigned to new underwriters and whether they were ultimately approved and later failed, resulting in a claim.

4. Further, Carrington issued a restriction that underwriters were not even permitted to enter the Servicing or Claims Divisions of the company.

See affidavit of Michelle Calderon, attached hereto as <u>Exhibit "A"</u>.  Due to this complete division dictated by Carrington itself, the claims division, where claims information could in theory be accessed, was held exclusively by Carrington Claims, to which Relator had no access.  For these reasons, the <u>Kennedy</u> ruling in fact applies to this scenario.

The <u>Kennedy</u> Court clearly states that the requirements of Rule 9(b) are to be relaxed when a plaintiff lacks access to all facts necessary to detail his claim and shows that "further particulars of the alleged fraud could not have been obtained without discovery."  <u>Kennedy,</u> 512 F.Supp 2d at 1167.  When that scenario arises, the facts can be pled on information and belief if they are facts inaccessible to the plaintiff, in which event he has pled the grounds for his suspicions.  <u>Id</u>.  Here, as in <u>Kennedy</u>, Relator has alleged with particularity facts regarding defendant's alleged scheme and specific facts, related to particular claims that were not within relator's reach.  <u>Id</u>.  Further, as in <u>Kennedy</u>, this Relator has drawn a reasonable inference that at least some of the loans that were fraudulently approved are included in the 30,900 claims made by Carrington in the last four years, which include the approximately 27,000 claims made from January 2014 to April 2017, and the nearly 3900 claims made from May 2017 to March 2018, details of which Defendant has in its exclusive possession.

Carrington admits in its Annual Financial Report for the Year End December 31, 2014, that its foreclosure rate was 10.59% for that year.  See Exhibit "B" attached hereto, p. 9.  For that same year, the national FHA foreclosure rate was approximately 2.15%.  See Affidavit of Derick Huntwork, attached hereto as Exhibit "C".  Comparing these foreclosure rates reveals that Carrington's failed loans were nearly five times that of the national average for FHA loans. As Kennedy sets forth above, when certain facts are inaccessible to Relator, the facts can be pled on information and belief, in which event Relator has pled the grounds for his suspicions.  Kennedy, 512 F.Supp 2d at 1167.  Carrington's percentage of foreclosures certainly raises heightened suspicion of wrongdoing.

Further, during Relator's employment, wherein she observed the fraudulent scheme discussed herein, Carrington sold a portion of its loans to other companies for servicing, which Carrington admits in its Annual Report totaled approximately $185,000,000 in loans in 2014. Relator would clearly have no access to claims made on those loans by the purchasing company. See Exhibit "B", p. 29.  With regard to loans approved under the scheme, and thereafter sold to third parties, the facts directly align with Kennedy in that the actual claims were made by a completely separate entity, to which Relator has no access.  These large number of loans sold represent additional claims that, on information and belief, were made on the Government, to which Relator lacked access, which again justifies the relaxed application of Rule 9(b) herein.

 The Court's prior order assumed a fact not in evidence: that Relator had access to all aspects of the fraud, including the claims it made on the U.S. Government, simply due to her employment at Carrington. There was no, and is no, evidence supporting this conclusion.  In fact, said conclusion is directly contradicted by the facts set forth above.  Furthermore, respectfully, to conclude that an employee of a company has access to ALL information held by that company is

pure speculation.   The <u>Kennedy</u> court made no distinction regarding employees verses non-employees.   In fact, it held that Rule 9(b) is relaxed when plaintiff shows that "further particulars of the alleged fraud could not have been obtained without discovery." <u>Id</u>. at 1167.   And although that court states that such a situation is more likely to arise when the relator's claims are based on fraud committed against third parties, it does not rule out application to cases where employees are purposefully denied access to the last piece of the puzzle to complete the Rule 9(b) requirements.   <u>Id</u>.   The case at bar exemplifies the precise reason that the relaxation of Rule 9(b) is necessary in some circumstances, i.e. to prevent those committing fraud from shielding access of all necessary information from those in positions to reveal their fraud on the Government.   Such deceitful behavior should not be rewarded with a dismissal of the action against them, especially where the underlying scheme is set forth.   A dismissal would not only sanction the cloaking of facts, but it would also promote the continuation of the ongoing fraudulent claims.

It is a much more reasonable inference, based on the facts presented, that Relator herein did <u>not</u> have access to the claims data or the applications for payment that were being submitted by Carrington's Claims Division. This case should survive Defendant's motion, as it was Defendant's improper restrictions to conceal the fraud that has left Relator without access to the claims information. Relator's affidavit establishes that Carrington prevented Underwriter access to Claims data, by design, so as to prevent any one person in the company, other than those coordinating the fraud, from having full knowledge of the complete history of any one file, in attempts to avoid a FCA claim succeeding.

In <u>Singer v. Progressive Care, SC</u>, 202 F.Supp.3d 815, 826-27 (N.D. Ill 2007), wherein a similar motion to dismiss was granted, the relator was Progressive's Chief Operations Officer and in fact had full access to the records at issue due to his position with the company.  Further, Mr.

Singer admitted therein that he had "in his possession and control, and previously provided to the Government in connection with his disclosures, the data/list of all patients who were subjected to defendants' fraudulent Procrit scheme." Id. at fn. 4.

This Court, in its Order Dismissing the Amended Complaint (Dt. 75), aligned Singer with the case at bar, which Relator respectfully requests reevaluation of said analogy herein.  Mr. Singer was the COO of Progressive and admitted to having in his possession specific patients' information that were involved in the scheme. Id.  By great contrast, Ms. Calderon was an underwriter, with absolutely no access to the Claims Department, and who had no ability to access specific claims records in any legitimate manner. The simple fact of being employed by a company should not be the standard by which access to corporate records should be determined. For example, to say a lab tech at Eli Lilly has access to the same records as does a Vice President of the company is at best, speculation.  Yet both are employees of Eli Lilly.  Such generalizations do not represent the reality of their distinctive positions with the company, which applies directly to the case at bar.

Although Relator did not have access to the claims details, she does possess substantial personal knowledge of Carrington's scheme to approve nonqualifying loans to be insured by the U.S. Government.  Surely the purpose of the FCA is not to encourage potential relators to violate the law to obtain the missing piece of information to satisfy a stringent Rule 9(b) application where, as here, relator had absolutely had no access to said information.  The spirit of the FCA is such that it should not be interpreted to encourage such conduct. The personal knowledge requirement should relate to the fraudulent scheme itself, where, on information and belief, claims were made on the U.S. Government stemming from such fraud.  A calculation of damages can occur at a later time.

The interpretation of the personal knowledge requirement in a manner suggested by the Defendants allows intentional conduct, such as that by Carrington, to put up barriers so that one individual does not have access to every component of the fraud.  Carrington employees in Underwriting do not have access to Servicing and Claims information. Carrington blocked Relator, and all underwriters, from access to claims data to determine which faulty loans failed and on which failed loans claims were made.  Rule 9(b)'s personal knowledge requirement should not be interpreted to allow such segregating conduct by a Defendant such as Carrington, which would secure its own protection from False Claims Acts actions, but for the application of the relaxed knowledge standard.

On information and belief, based on the ongoing scheme, and the number of claims made by Carrington on the U.S. Government, Carrington submitted claims for payment on the unqualifying loans that were fraudulently approved and the Government was damaged. Kennedy, 512 F. Supp. 2d at 1167.

Further, the fraud alleged in the case at bar is distinctive, as the underlying fraudulent approval of loans generally occurs YEARS before the actual claims are made.  For instance, a nonqualifying loan may be approved in 2015, wherein the borrower pays on the loan for 18 months, then a foreclosure action takes another 18 months to conclude, and it is not until 2018 that the actual claim is made on the U.S. Government.  Therefore, the great majority of the actions perpetrating the fraud, i.e. the "scheme" in approving the bad loans, are likely to occur years before the actual claim is made on the U.S. Government.  This final step in the scheme, to which Relator had absolutely no access, is detached from the underlying fraudulent approval of a loan that did not qualify under FHA requirements. With that said, the Claims employee submitting the claim after the loan failed did not underwrite the loan, nor would they have detail of the loan application

and process that was fraudulently approved three or more years prior to the claim submission. Therefore, Carrington has created a perfect dichotomy within which to exist, with no fear of being exposed for its fraud on the Government if Rule 9(b) is strictly applied. This scenario is PRECISELY why there is a relaxation of the Rule 9(b) particularity requirement, without which, companies like Carrington could continue to play the system and move to dismiss FCA claims due to a lack of access to information it intentionally put in place to protect its fraudulent stream of income from the U.S. Government.

For this reason, the case at bar should be treated as that in <u>Kennedy</u>, i.e. with the relaxed Rule 9(b) requirement due to lack of access to the claims materials.

A major purpose underlying the specificity requirement in Rule 9(b) is to prevent individuals with no personal knowledge regarding the underlying fraud scheme from bringing an action and attempting to learn ALL of the detail through discovery.

> Seeking the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own, Congress overhauled the statute once again in 1986 to make the FCA a more useful tool against fraud in modern times.

<u>Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson</u>, 559 U.S. 280, 294, 130 S. Ct. 1396, 1406-07 (2010) (internal quotations and citations omitted).

> [W]here the choice is between having no relator and having a relator with direct and independent knowledge as to the essential elements of the underlying scheme, if not all its tertiary details, the latter choice best comports with the policy of the False Claims Act.  Further, this interpretation encourages insiders to bring qui tam actions.

<u>United States ex rel. Galmines v. Novartis Pharms. Corp.</u>, 88 F. Supp. 3d 447, 456-57 (E.D. Penn 2015) (*distinguished on other grounds*).

8

Further, <u>United States ex rel. Lusby v. Rolls-Royce Corp.</u>, 570 F.3d 849 (7th Cir. 2009) is directly on point with the case at bar. In <u>Rolls-Royce</u>, a Southern District of Indiana case, relator was an engineer for defendant, which produced engines sold to the military. Relator came to believe that defendant was falsely advising the United States that the engines it was purchasing conformed to the Government's specifications. <u>Id</u>. at 850.  Realtor filed a qui tam action under 31 USCS § 3729 of the FCA, wherein the United States declined to intervene. <u>Id</u>. at 851.  Rolls-Royce moved to dismiss the action on the ground that the complaint did not plead fraud with the particularly required by Rule 9(b), which resulted in a dismissal of the action.  <u>Id</u>.

The 7th Circuit reversed the District Court's grant of defendant's Rule 9(b) motion to dismiss. That complaint alleged that contracts between Rolls-Royce and the United States required that: 1) all engine parts meet particular specifications; 2) that the parts in fact did not meet those specifications; 3) that defendant knew that the parts were noncompliant; and 4) that defendant nonetheless certified that the parts met the Government specifications.  <u>Id</u>. at 853-854.

Rolls-Royce argued that relator had not seen any invoices submitted to the United States, and therefore did not have personal knowledge of the invoices/actual requests for payment to the Government. The Court of Appeals found that "[s]ince the realtor is unlikely to have those documents unless he works in the defendant's accounting department, the district court's ruling takes a big bite out of qui tam litigation.  <u>Id</u>. at 853-854. The Court went on by pointing out that "much knowledge is inferential – people are convicted beyond a reasonable doubt of conspiracy without a written contract to commit a future crime – and the inference that Lusby proposes [that applications for payment were submitted to the Government] is a plausible one." <u>Id</u>. at 854.

Rolls-Royce's contracts with the Government required it to certify compliance of its product with the Government's specifications.  The court found that if Rolls-Royce submitted such

a certificate, knowing the representations to be false, then it committed fraud.  Id.  Similarly, in

the case at bar, Carrington was required to certify to the Government that the loans it had approved

for FHA Insurance met the specifications and requirements set forth by the FHA, and that said

loans were of the quality required by the Government for its HUD program.  Relator herein has

alleged, with specific facts, that Carrington made such certifications, knowing the representations

to be false, and it therefore has committed fraud. The allegation, on information and belief, that

many of those fraudulently approved loans resulted in claims on the Government, of which there

are in excess of 30,000, and counting, is a definitely "a plausible one."  Id.  Even a requirement of

proof beyond a reasonable doubt need not exclude all possibility of innocence; nor need a pleading

exclude all possibility of honesty in order to give the particulars of fraud.  Id.  Relator has met her

pleading burden and justice requires that Defendant's motion be denied.

Carrington's corrupt segregation scheme would further be promoted by the dismissal of

this action due to 31 USCS § 3730(b)(5), which sets forth that "[w]hen a person brings an action

under this subsection, no person other than the Government may intervene or bring a related action

based on the facts underlying the pending action."  As the Government has not yet intervened in

this case, a dismissal of the action currently pending would eliminate any other person from

bringing this action against Carrington, which would solidify the success of its segregation of

information from employees and permit Carrington's fraud to continue into the future.  See

Galmines, 88 F. Supp. 3d. at 457 (holding that a dismissal of the complaint, in which the relator

had substantial personal knowledge, if not complete knowledge, could allow a defendant to escape

liability for any related fraud that occurred after the filing of the lawsuit, where the Government

has thus far declined to intervene and all other potential relators would be barred under the first-

to-file rule.  Such a result does not comport with the law or policy of the False Claims Act).

A dismissal of this action due to Relator's lack of knowledge of specific claims made, affirms Carrington's unscrupulous behavior of creating procedures that eliminate the risk that one person, a potential relator, might have access to and obtain personal knowledge of all aspects of the fraudulent scheme, including claims made. A perpetrator of fraud against the Government, thus the taxpayers, should not be rewarded, and permitted to continue the fraud, when ITS segregation of employees and information undermines the purpose of the FCA, which is to "supplement federal law enforcement resources by encouraging private citizens to uncover fraud on the government." United States ex rel. Rost v. Pfizer, Inc., 507 F.3d 720, 727 (1st Cir. 2007). "'Congress made it clear that its overall intent in amending § 3730 was to encourage more private enforcement suits. It emphasized its belief that in the face of sophisticated and widespread fraud . . . only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds.'" United States v. Bisig, 2005 U.S. Dist. LEXIS 38316, at *10 (S.D. Ind. Dec. 21, 2005); citing United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 648 (6th Cir. 2003) (internal punctuation and citations omitted).

## II. DISCOVERY

1. **Personal Knowledge of Relator Prior to Discovery**.

Pages 13-14 of Defendant's Brief on its Motion to Dismiss ("MTDB"), set forth that to comply with Rule 9(b), a qui tam relator's allegations must be the product of her independent knowledge and "precomplaint investigation" – not discovery material obtained from the defendant after the complaint was filed.

Relator's allegations were made pre-discovery, with the only missing specificity being the claims information concealed by Defendant, which was uncovered in discovery and included in

the SAC to merely support Relator's prior allegations. Information on the claims made was uniquely held by Defendant with no availability to underwriters, such as Relator, by design.

Realtor's pre-discovery personal knowledge is in fact supported by Defendant's discovery responses, as the fact scenarios set forth in the four exemplar files in the SAC are actual examples of the fraudulent activities Relator set forth in her original and First Amended Complaints. The exemplar cases establish that this FCA suit was not brought as a fishing expedition by an individual who came to the table with no personal knowledge in hopes to learn all necessary facts through discovery. Vicom, Inc. v. Harbridge Merck Servs., Inc., 20 F.3d 771, 777 (7th Cir. 1994). What better representation of Relator's personal knowledge than validation of those allegations by Defendant's own casefiles. This Complaint and discovery were not filed as a fishing expedition; Relator had substantial personal knowledge of the scheme perpetrated by Carrington from her employment therewith but lacked access to information related to damages due to Carrington's systematic cloaking of claims data.

Defendant asserts that Relator has thus far offered nothing of her own to show that her claims of fraud are "responsible and supported" at the outset of this litigation (MTDB, p. 18), however, this is far from accurate, as Relator has given substantial examples of her pre-claim knowledge, as follows:

a. Relator identified numerous employees of Carrington that approved or dictated the approval of loans that were missing required documents, such as pay stubs, bank statements, W-2's, gift letters and payoff verifications; wherein the documents in the loan files were inconsistent with one another, such as where the income reflected on a borrower's pay stubs was inconsistent with the income reflected on the borrower's other paperwork; and, in the case of refinances, the loans were delinquent at the time of closing or had late payments in the previous 12 months. (SAC, ¶ 6, 35). These allegations, based on Relator's personal knowledge, were further supported by the exemplar loans set forth in the SAC ¶ 6.

b.  Relator identified numerous employees of Carrington that manipulated or dictated the manipulation of TOTAL Mortgage Scorecard to obtain "accept/approve" ratings for its FHA loans, in violation of HUD Mortgagee Letter 05-15.  If Carrington ran a loan through its AUS and the loan did not receive an "accept/approve" rating from TOTAL, Carrington frequently re-ran the loan through its AUS/TOTAL multiple times over a short period, each time entering into the AUS/TOTAL hypothetical data points that lacked a factual basis, to determine the data point values that would result in an "accept/approve" rating (SAC, ¶ 8, 28). These allegations, based on Relator's personal knowledge, were further supported by the exemplar loans set forth in the SAC ¶ 6.

c.  Relator identified numerous employees of Carrington that violated HUD's requirement that upon denial of a loan by an underwriter, the denial was to be entered into the Connection as a denied loan, therefore creating a red flag on that application, with a specific example of same. Further, Relator identified a meeting wherein Senior Management directed the underwriters NOT report denials in FHA Connection, and that Carrington knew this was a violation of HUD requirements. (SAC, ¶ 9). These allegations, based on Relator's personal knowledge, were further supported by the exemplar loans set forth in the SAC ¶ 6.

d.  Relator identified specific defects in loans that were approved by identified employees, which violated HUD standards and did not qualify for FHA insurance, such as files that were missing pay stubs, bank statements, and W-2s; files with inconsistent information in the loan files such as inconsistent income reporting, inconsistent debt and creditors, undocumented gifts, and unverified bank accounts; failure to verify the borrowers' employment and rental histories; and in the case of refinances, failure to confirm that the loans being refinanced were current at the time of closing and that borrower qualified for the approved refinance option. (SAC ¶ 35).  These allegations, based on Relator's personal knowledge, were further supported by the exemplar loans set forth in the SAC ¶ 6.

e.  Relator identified specific examples, and which employees were involved, in manipulating the data entered into Carrington's AUS to determine the variable amounts that would generate "accept/approve" ratings from TOTAL.  For instance, if TOTAL did not approve a loan with lender income of $50,000, the employees would submit fictitious income for that borrower numerous times until they came up with an "accept/approve" in the system.  Further, if a loan

received a "refer" rating, many Carrington employees would isolate one or more variables, such as borrower's assets, income or debt) and slightly yet systematically increase or decrease the variable(s) during successive AUS/TOTAL runs over a short period of time to identify the variable amount(s) that would result in an "accept/approve" rating. (SAC ¶¶ 41, 42). These allegations, based on Relator's personal knowledge, were further supported by the exemplar loans set forth in the SAC ¶ 6.

    f.  Relator identifies conversations and direct orders from supervisors regarding instructions to disregard specific HUD reporting requirements.  (SAC ¶ 9).

**2.  Use of Discovery.**

Relator has substantial personal knowledge and facts surrounding Carrington's fraudulent scheme from her employment with Carrington, which knowledge is merely supported by evidence produced by Carrington in discovery. Any allegation that she has no personal knowledge regarding the fraudulent scheme at Carrington fails to recognize all allegations made prior to any production by Carrington.  Caselaw repeatedly states that ALL facts establishing fraud cannot be learned through discovery.  In United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 456 (4th Cir. 2013), cited by Defendant herein, the Court noted "multiple purposes of Rule 9(b), namely, of providing notice to a defendant of its alleged misconduct, of preventing frivolous suits, of eliminat[ing] fraud actions *in which all the facts are learned after discovery*,' and of 'protect[ing] defendants from harm to their goodwill and reputation'") (citation omitted); United States ex rel. SNAPP, Inc. V. Ford Motor Co., 532 F.3d496, 504 (6th Cir. 2008)(same).  This is in no way a case where Relator learned "all facts" through discovery, which has clearly been set forth above.  The only thing learned through discovery was the information Carrington concealed from Relator, therefore eliminating her access to claims information.   Herein, Relator set forth substantial facts prior to conducting discovery that were ongoing during her tenure with Carrington.

Further, Relator should be permitted to supplement her extensive personal knowledge of Carrington's fraudulent scheme with examples produced by Carrington in discovery. While it is true that one purpose of Rule 9(b) "is to discourage the filing of complaints as a pretext for discovery of unknown wrongs," the wrongs here were in no way "unknown" by Relator. Madonna v. United States, 878 F.2d 62, 66 (2d Cir. 1989).  Further, this does not mean "that a party may never use information obtained in discovery to supplement a complaint that otherwise passes muster under Rule 9(b)." United States ex rel. Raffington v. Bon Secours Health Sys., 2018 U.S. Dist. LEXIS 12518, at *30 (S.D.N.Y. Jan. 25, 2018).  And as set forth above, due to the concealed claims information by Carrington, the Complaint passes muster under the relaxed Rule 9(b) standards, and said discovery actually confirms the fact that Relators pre-discovery allegations were accurate and were occurring at Carrington during her tenure.

Caselaw has repeatedly allowed parties to supplement False Claims Act allegations with information obtained during discovery. In United States ex rel. Galmines v. Novartis Pharm. Corp., 88 F. Supp. 3d 447, 451 (E.D. Pa. 2015) (distinguished on other grounds), the court held that "it would make little sense not to allow a relator to obtain these details [regarding damages] during discovery and amend her complaint accordingly." Similarly, the specific information learned by Relator in discovery goes to the damages, not the underlying fraudulent approval and certification of nonqualifying loans scheme itself, of which Relator has substantial personal knowledge that preceded discovery. Relator has not filed her complaint as a "pretext for discovery of unknown wrongs," rather she had substantial personal knowledge of the fraudulent scheme that was merely supported by examples from discovery. Madonna, 878 F.2d at 66. Likewise, in Ohman v. Kahn, 685 F. Supp. 1302, 1308 n.3 (S.D.N.Y. 1988), the Court held that "[i]f plaintiffs [could not] be more specific now concerning these materials, they might be able to do so at the end of discovery,"

at which point the Court would allow a motion to amend the complaint to include facts learned during discovery. Similarly, Relator should be permitted to supplement her Complaint with supporting facts learned in discovery.

### III. FALSITY

Relator has alleged, from her personal knowledge, an elaborate scheme of fraudulent underwriting practices, citing to details of regulations violated, specific activities engaged in, and persons engaging in same, and the likelihood that loans approved in this manner were some of the $200,000,000 payout by the U.S. Government. As set forth above regarding the 9(b) requirements and Relator's lack of access to claims information, this detail creates a reasonable inference that the fraudulent activity resulted in a paid claim.  See Kennedy, 512 F. Supp. At 1167; see also Rolls-Royce, 570 F.3d at 854.   Even so, Relator has also connected these fraudulent underwriting practices to specific approved loans, identified the underwriter who approved the loan, and connected the loans to defaults and claims on the U.S. Government. Even without a relaxed Rule 9(b), the following four loans alleged in the SAC merely support and affirm Relator's pre-discovery personal knowledge regarding the details of the fraud perpetrated by Carrington.

Loan 1 identified a borrower in Lindale, Texas, and several fraudulent underwriting practices were present in this loan, including: missing gift letters; failure to consider debt of non-purchasing spouse; missing employment and income verifications; missing evidence of debt payoff or sources of funds; missing documentation of assets; exclusion of collections debt from the Underwriting Analysis without explanation; and omission of creditors without explanation. The underwriter approving this loan was identified as Desktop Underwriter ("DU") user 148n2jlm. The violations of HUD requirements outlined above and submission of fraudulent information resulted in a default after four payments, with claims being made on and paid by the U.S.

Government totaling $102,948.77. SAC, ¶ 6(a).  Further, Relator set forth in the SAC that HUD has advised Direct Endorsement Lenders ("DELs"), via HUD 4155.1 4.C.1.a, that past credit performance serves as an essential guide in determining the borrower's attitude toward credit obligations and in predicting a borrower's future actions.  (SAC ¶ 23).

Loan 2 identified a borrower in Florence, Kentucky, with fraudulent underwriting practices contained in this loan including: missing verification of debt responsibilities of former partner; missing verification of debt disputes; missing 1040s, inconsistent bank statements, and no acquisition of tax returns or income verifications; missing liabilities discovered in the credit report without explanation; a missing gift letter; missing twelve-month rental history verification; and a missing debt letter. The loan was submitted and approved by an underwriter identified with CHUMS ID Aa79. This fraudulently approved loan resulted in default after one on-time payment, and five payments that were more than thirty days late. The reason for default was listed as curtailment of income. Claims were made on and paid by the U.S. Government totaling $50,284.88 to date. SAC, ¶ 6(b).  Again, HUD has advised DELs that past credit performance is essential to determining borrowers' likelihood of paying on the loan.  (SAC ¶ 23).

Loan 3 identified a Borrower in Bonaire, Georgia, with fraudulent underwriting practices of: missing verification of credit accounts denied by Borrower; missing twelve-month rental history verification; inconsistent reported income, missing employment verifications, missing tax records; and an invalid application of a low down payment as a compensating factor, when said down payment actually increases the risk of the loan. This fraudulent loan defaulted after only seven payments, with one being returned due to insufficient funds. This resulted in claims against the U.S. Government for $8,471.95 in foreclosure costs alone to date, in addition to losses on the

house that are missing from the file. SAC, ¶ 6(c).  The language of SAC ¶ 23 is again applicable to this loan, with regard to the materiality of the major deficiencies of the loan.

Loan 4 was a refinance with a Borrower from Savannah, Georgia, wherein several fraudulent underwriting practices existed: the invalid deletion of Borrower 4's ex-husband from the title of the loan as there was no valid transfer of his interest and further, the improper transfer was attempted too close to the loan refinance; failure to subject Borrower 4 to a credit qualification; missing 1040s, 1120s, and K-1s; and apparent failure to review tax returns. Loan 4 defaulted after one payment made two weeks late, a second payment made two months late, and no further payments after the second. The reason listed for default was excessive obligations, same income, including habitual non-payments of debs. According to HUD guidelines, this category is used when delinquency is attributable to the borrower having incurred excessive debts that prevent them from making payments on those debts and the mortgage debt. This default resulted in claims made on and paid by the U.S. Government in the amount of $49,462.04. SAC, ¶ 6(d).  Again, habitual non-payments of debt has been identified by HUD as a material factor in its evaluation of loans qualifying for FHA Insurance. (SAC ¶ 23)

Further, these four cases exemplified the rampant fraudulent use of multiple DU submissions by Carrington underwriters. Carrington alleges on page 20 of its Motion that Relator has failed to allege a HUD regulation that this practice violates, though Relator did just this in Paragraph 28 of her Second Amended Complaint:

> Direct Endorsement Lenders are not permitted to manipulate the information they enter into an AUS/TOTAL to determine what specific variable amounts would result in an "accept/approve" rating. For example, if a Direct Endorsement Lender receives a "refer" rating after entering all relevant data points into an AUS/TOTAL, the lender may not then enter hypothetical income or asset amounts (i.e., income or asset amounts that lack a factual basis) in an effort to determine what level of income or assets would generate an "accept/approve" rating. Rather, as made clear by Mortgagee Letter 05-15 and FHA's TOTAL Mortgage Scorecard User Guide,

there must be a factual basis for each variable entered into an AUS/TOTAL. Lenders are 27 not to "willfully manipulate the application variables ... to obtain an accept/approve risk classification." HUD Mortgagee Letter 05-15.

While Defendant points out that there are legitimate reasons to run multiple DU submissions, including "(a) changes in information after verification is initially received from employers or banks, (b) changes during the application period in income, assets, or debts of the borrower, or (c) appraisal updates affecting value," it seems beyond incredulous that these legitimate reasons were at play when numerous submissions were being run minutes apart. See Motion to Dismiss, p. 20. See SAC, ¶ 6(a). These repetitive submissions that were unsupported by data, along with the insertion and omission of various factors that later reappear, do more than "nudg[e]" these allegations regarding multiple DU submissions "across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

Carrington also alleges that an underwriter is not required to obtain an explanation if a borrower's debt is classified as a collection account, a charge off account, or a judgment, citing to FHA Single Family Housing Policy Handbook 4000.1 at Section II.A.4.b.iii.A (2016). MTDB, pp 20-21. However, HUD 4155.1 was in effect at the time of Relator's tenure, wherein Section 4.C.2.d states:

> Collections and judgments indicate a borrower's regard for credit obligations, and must be considered in the creditworthiness analysis. The lender must document reasons for approving a mortgage when the borrower has collection accounts or judgments. The borrower must explain, in writing, all collections and judgments.

Thus, Relator's allegations that Carrington's underwriters failed to document or explain certain debts on some loans in violation of HUD requirements is substantiated, and Carrington underwriters did in fact violate baseline requirements to properly certify the loans for FHA Insurance.

Defendant's Motion to Dismiss next asserts that Plaintiff's SAC alleges "in a conclusory fashion" that missing documents were HUD violations with no allegation that the documents were required in the files.  MTDB, p. 22. On the contrary, Relator alleges specific HUD guidelines throughout the Second Amended Complaint, and especially in regard to the four loans detailed in Paragraph 6, violated by Defendant's fraudulent underwriting scheme. Specific HUD violations detailed by Relator include:

1. failure to consider a non-purchasing spouse's debt in violation of HUD 4155.1 4.A.5.c, ¶ 6(a)(iii);
2. omission of creditors in submissions without explanation in violation of HUD 4155.1 4.C.1.c, 4.C.2.d and 4.C.4.b, ¶ 6(a)(iii), 6(a)(vii), 6(b)(v), 6(b)(vii), 6(c)(vi);
3. failure to verify two years of employment and income verifications with W-2s or paystubs in violation of HUD 4155.1 4.D.1, ¶ 6(a)(vi), 6(b)(viii);
4. omission of debts in collection in submissions without explanation in violation of HUD 4155.1 4.C.4.b and 4.C.2.d, ¶ 6(a)(xvi);
5. failure to include gift letters in violation of HUD 4155.1 5.B.5.a, ¶ 6(a)(xx), 6(b)(xi);
6. failure to verify twelve-month rental history in violation of HUD 4155.1 4.C.2.b, ¶ 6(b)(xii), 6(c)(vii);
7. improper analyzation of a down payment that would qualify as a compensating factor in violation of HUD 4155.1 4.F.3.b, ¶ 6(c)(xi);
8. and improper deletion of co-borrower from title and failure to subject remaining co-borrower to credit qualification in violation of HUD 4155.1 6.C.2.d, ¶6(d)(iii).

These are mere examples of the allegations already presented based on Relator's personal knowledge. As set forth above, Rule 9(b) specificity regarding the claims made should be relaxed due to lack of access. All of the above allegations, and examples of fraudulent activity, both specific and general, set forth enough facts to create a reasonable inference that the fraudulent activity has resulted in a paid claim.  See Kennedy, 512 F. Supp 2d at 1167.  Further, the degree of detail in the SAC provides more than adequate notice to Defendant of its alleged misconduct. See Takeda Pharm. N. Am., Inc., 707 F.3d at 456.

20

Relator was pressured on a daily basis to violate HUD regulations herself, and witnessed the other underwriters in her department receive the same pressure, to push loans to approval that violated the basic risk requirements set forth by the FHA.  See Exhibit A, ¶ 9.  Relator witnessed her coworkers and supervisors, as set forth in the SAC, violating HUD requirements and approving loans that were of a much greater risk than what the FHA tolerates to insure the loans.  Defendant seems to argue that since Relator herself refused to participate in the fraud on the U.S. Government by submitting such lies herself, that her personal knowledge of what those around her were doing to defraud the Government should be disregarded.  Certainly the FCA does not require relators to be participants in the fraud for their personal knowledge to be accepted as legitimate allegations of the scheme.  Should this case be dismissed, deceptive acts by Carrington would be rewarded while virtuous conduct by Relator is punished.

## IV. SCIENTER

Initially Relator finds it necessary to clarify a prior allegation that Relator admits quality control reviews were performed by Carrington on all of its loans.  In fact, Realtor made no such admission.  Specifically, Relator sets forth that "any reasonably diligent quality control personnel should have uncovered the violations while conducting the mandatory quality control reviews of Carrington's closed files."  SAC ¶ 39.  The intended implication of paragraph 39 was there were not quality control reviewed being done by Carrington, much less being done by reasonably diligent personnel.

Carrington asserts that Relator has failed to allege violations of HUD requirements, and thus failed to allege that Carrington knew or should have known that these violations rendered the loans ineligible for FHA insurance. Defendant also argues that Relator has failed to allege that any specific inaccuracy was universally unacceptable in that it would have been regarded by HUD as

precluding FHA's insurance of that loan. Defendant repeatedly minimizes its purposeful and fraudulent underwriting actions as "inadvertent" errors. MTDB, p. 28.

On the contrary, Relator alleges that Carrington continually made false representations to the Government that these loans were approved pursuant to FHA guidelines and were quality loans that qualified for FHA insurance. In fact, Relator alleges specific directives from her superiors to actively disregard guidelines designed to protect HUD from insuring bad loans. Examples of these specific directives were from Lisa Pratt, Underwriting Manager, who directed Relator to NOT report a denial in FHA Connection, even though the loan had been denied three times; and Jeff Gillis, Senior Management, directed the underwriters to NOT report denials in FHA Connection. These directives to disregard guidelines circumvented one way HUD monitors its Direct Endorsement Lenders, and was a knowing false representation to HUD about the quality of its loans. SAC, ¶ 9.

Carrington, as a Direct Endorsement Lender, was tasked with employing underwriters to "evaluate [each] mortgagor's credit characteristics, [the] adequacy and stability of [the mortgagor's] income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.S(d), SAC ¶ 18, (emphasis added). The underwriters approving FHA loans become agents of the FHA when they are approved and receive their CHUMS number.  See Exhibit A, ¶ 3. Their prime directive is to evaluate loans pursuant to the FHA's requirements, and at the very least, their intentional failure to enforce HUD guidelines constitutes reckless approval of loans. The underwriters were actively violating HUD requirements by approving loans missing important verification documents and submitting fraudulent information into DU, as explicitly detailed in the

preceding section. Further, these inaccuracies were not merely tripping up on regulatory complexities, rather the underwriters were violating principle mandates of the regulations, such as accurate income, accurate debt reporting, and requirements for documentation of income and obligations. These requirements are directly related to the ability of the borrow to repay the loan and assuring the loan is a good credit risk as to qualify for FHA insurance. Submission of a loan for FHA insurance is a certification that the loan meets all applicable regulations and policies, Form HUD-92900-A[1]; the active violation or reckless disregard of these applicable regulations and policies meets the scienter requirement of the False Claims Act.

However, should the Court disagree that these practices meet the scienter requirement, Relator has alleged in her affidavit that she brought her concerns about the fraudulent underwriting practices to her supervisors at Carrington. Considering all factors before the Court, for Carrington to deny that it had any knowledge of the fraudulent underwriting scheme would be "deliberate ignorance" of the facts. See United States ex rel. Yannacopoulos v. Gen. Dynamics, Inc., 652 F.3d 818 at 833 n.14 (7th Cir. 2011) (citing 31 U.S.C. § 3729(b)).

## V. MATERIALITY

Defendant criticizes the SAC claiming it fails to allege the false statements made by Carrington would be material to the Government's decision to pay the claims.  MTDB, 29. However, this is not the case.  Relator has made numerous connections between the fraudulent underwriting decisions made by Carrington and why those decisions/misrepresentations would be a material violation to HUD in its decision to pay the claim.  Carrington's actions in approving

---

[1] See HUD Handbook 4000.1, I.A.3.b.iii(A), requiring Direct Endorsement Lenders to sign a Certification Statement with the following clause: "I acknowledge that, upon approval, and *with its submission of each loan for insurance or request for insurance benefits*, the Mortgagee will be subject to all applicable HUD regulations, Handbooks, Guidebooks, Mortgagee Letters, Title I Letters, policies and requirements, as well as Fair Housing regulations and laws including but not limited to 24 CFR § 5.105, Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act) and Title VI of the Civil Rights Act of 1964."

nonqualifying loans were systematically more than "technical failures" or "oversights" in the underwriting process.   The fundamental financial health of the applicants was being intentionally manipulated for approval, creating huge loss risks for HUD.

Under 24 C.F.R. § 203.5(d) the vital, and most material, aspects of the underwriting evaluation are set forth, that being credit characteristics, stable income, and available assets. SAC ¶ 18.  The issue of materiality is addressed in Universal Health Services v. United States ex rel. Escobar, 136 S. Ct. 1989, 2001-2002 (U.S. 2016), as follows:

> A defendant can have "actual knowledge" that a condition is material without the Government expressly calling it a condition of payment. If the Government failed to specify that guns it orders must actually shoot, but the defendant knows that the Government routinely rescinds contracts if the guns do not shoot, the defendant has "actual knowledge." Likewise, because a reasonable person would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition would amount to "deliberate ignorance" or "reckless disregard" of the "truth or falsity of the information" even if the Government did not spell this out.

Escobar addresses the materiality requirement from a variety of angles, including 1) the statutory definition ("the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property" 31 USCS § 3729(b)(4)), 2) the Treatise definition (materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003) (Williston)), and 3) the tort law definition (a "matter is material" in only two circumstances: (1) "[if ] a reasonable man would  attach importance to [it] in determining his choice of action in the transaction"; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter "in determining his choice of action," even though a reasonable person would not. Restatement (Second) of Torts §538, at 80).  Escobar, 136 S. Ct. at 2002-03.

The underlying purpose of the FHA HUD Insurance Program is to insure loans for borrowers who qualify with their income, debt, creditworthiness, and assets.   Logic dictates that those four factors are material to the underlying decision to issue the insurance in the first place, and whether the claim will be ultimately paid, if made.  The Supreme Court in <u>Escobar</u> made a very clear point in concluding its opinion, that "[r]espondents have alleged that Universal Health misrepresented its compliance with mental health facility requirements that are so central to the provision of mental health counseling that the Medicaid program would not have paid these claims had it known of these violations. Respondents may well have adequately pleaded a violation of §3729(a)(1)(A). <u>Escobar</u>, 136 S. Ct. at 2004.  Relator has likewise alleged that Carrington misrepresented its compliance with FHA mortgage requirements that are so central to the provisions of the U.S. Department of Housing and Urban Development Insurance program, that the FHA would not have paid these claims had it known of these violations.  When the false information provided goes to the central purpose of the claim, it is illogical and unreasonable to find anything but materiality in that fraud.

Further, in the SAC, Relator alleges that HUD has informed DELs, including Carrington, that past credit performances serve as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.  SAC ¶ 23. Thus, HUD has made it clear that accurate credit performance and history evaluation and reporting is a material factor in the approval of the loan, and thus any potential payment of a claim.   HUD 4155.1 4.C.1.a. Not only had HUD specifically identified accurate credit information as "essential," Carrington knew or should have known about this focal concern of HUD, and yet certified loans that failed to meet this requirement.

## VI. HUD REQUIREMENTS

Carrington discusses the process for claim submission to HUD for insurance benefits and that all required claim documentation be submitted. MTDB, 5-6. However, it should be made clear that this would not be a "re-evaluation" of the loan quality, such is done at the underwriting stage. In fact, Carrington admits that the only information transmitted to HUD once a loan closes is a final Finding Report that does not include any additional borrower information that previously may have been entered into either AUS or TOTAL. Id. at 4. Thus, any information left out of the final Finding Report is shielded from HUD's knowledge. The claims process does not reevaluate the legitimacy of the loan, it's merely a form submission system. HUD Handbook 4000.1, IV.3.

Defendant's Motion to Dismiss also incorrectly alleges that Relator misstates HUD requirements. Specifically, Carrington claims that Relator cites to guidelines that only apply when the loan is manually underwritten, and that the loans in the SAC were underwritten using DU. MTDB, 21. In the section cited by Defendants, paragraph 6.a.xvi. of the SAC, Plaintiff alleges that Loan 1 was "refer/eligible" and as such fell under the cited HUD section. In fact, three of the four loans references in the SAC were "refer/eligible", requiring the files to be manually underwritten. Carrington admits same earlier in its brief: "Loans that received a "refer" rating were manually underwritten by Carrington and required additional documentary support." Id. at 4. Thus, it was not a misstatement to allege violations that apply when a loan is underwritten manually to loans that were underwritten manually.

## VII. CONCLUSION

Relator has presented substantial evidence and information to the Court, possessed prior to discovery, which demonstrates an elaborate and ongoing scheme by Carrington to defraud the U.S.

Government.  Further, Carrington purposefully shrouded claims data so as to evade a successful FCA suit such as the case at bar.

As set forth above, where the choice is between having no relator and having a relator with direct and independent knowledge as to the essential elements of the underlying scheme, if not all its tertiary details, the latter choice best comports with the policy of the False Claims Act.  Further, this interpretation encourages insiders to bring qui tam actions.  Galmines, 88 F. Supp. 3d at 456-57.

While Relator trusts the Court will deny Defendant's Motion to Dismiss, should that not be the resulting order to the Motion, Relator respectfully requests leave to Amend her Complaint to satisfy any deficiencies the Court may find. Fed. R. Civ. P. 15 allows litigants to amend their pleadings "once as a matter of course" and then either "with opposing party's written consent" or with the "court's leave." Fed. R. Civ. P. 15(a). Courts should "give leave when justice so requires," Id.

WHEREFORE, Plaintiff, United States of America ex rel. Michelle Calderon, respectfully prays for an order denying Defendant's Motion to Dismiss, and for all other just and proper relief.

Respectfully submitted,

/s/ Jennifer L. Blackwell
Jennifer L. Blackwell, Atty No.: 19269-49

ORZESKE - BLACKWELL, P.C.
50 East 91st Street, Suite 104
Indianapolis, IN  46240
Telephone:  (317) 846-4000
Telecopier: (317) 846-8000
jblackwell@indylitigation.com

Attorney for Plaintiff,
United States of America ex rel. Michelle Calderon

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 30th day of March, 2018, a copy of the foregoing was filed electronically using the CM/ECF system and is available to all counsel of record using same.

> */s/ Jennifer L. Blackwell*
> Jennifer L. Blackwell